## RAY v. UNITED STATES.
### No. 11641.

Circuit Court of Appeals, Eighth Circuit.

Sept. 23, 1940.

Rehearing Denied Oct. 15, 1940.

Writ of Certiorari Denied Dec. 9, 1940.

See 61 S.Ct. 318, 85 L.Ed. ——.

Francis Murphy, of Fargo, N. D., and W. C. Crawford, of Dickinson, N. D., for appellant.

P. W. Lanier, U. S. Atty., of Fargo, N. D., (Mart R. Vogel, Asst. U. S. Atty., of Fargo, N. D., on the brief), for appellee.

Before WOODROUGH and THOMAS, Circuit Judges, and BELL, District Judge.

BELL, District Judge.

The appellant and one Mary V. Schutte were charged in count 1 of an indictment with conspiracy to violate Section 592, Title 12, U.S.C., 12 U.S.C.A. § 592, and in counts 2 to 32, inclusive, with the violation of said Section. Count 1 was dismissed. The defendant Schutte entered a plea of guilty to counts 2 to 32 inclusive. Appellant was tried and convicted on counts 2 to 32 inclusive and was sentenced to serve three years in the penitentiary on each count, the sentences to run concurrently. From the judgment this appeal was taken.

The Stockmens State Bank of Medora, North Dakota, was insured by the Federal Deposit Insurance Corporation as provided by Section 264, Title 12, U.S.C., 12 U.S.C.A. § 264. The bank was closed September 24, 1938, with assets of $47,873.23 and liabilities of $175,936.58. At the time of the trial the Insurance Corporation had paid depositors' claims of approximately $72,000.

Appellant for many years was engaged in ranching, buying and marketing livestock, operating a "dude ranch" and producing "rodeo shows." He owned an interest in a coal mine, a general merchandise store, a gasoline service station, a souvenir shop, and had held the office of Register of Deeds. He was admitted to the bar and had served as State Attorney in his county for fourteen years. Considering the community in which he operated, he was "boring with a big auger," and was considered a "dominant figure in his community." He was a customer of the bank but not an officer or stockholder. He kept little or no books in connection with his various business enterprises or of his bank balances and a portion of the time received no statements from the bank showing the condition of his bank account. At times checks were drawn on his account by his wife, son and daughter.

The defendant Schutte was cashier and in charge of the bank from 1924 until it closed. She was a school girl friend of appellant's wife, a bridesmaid at the wedding and godmother to the first baby. She lived next door to appellant and was an intimate friend of the family throughout the years. She was first employed in the bank as assistant cashier in 1913 and as cashier in 1924. Apparently, the directors had little or no part in the management of the bank. Appellant became a depositor in the bank in 1916. He had overdrafts from time to time in the bank prior to 1924 but had always paid them. When the defendant Schutte took charge of the bank his overdrafts increased and he was unable to meet his obligations. Even though he had no money on deposit he drew checks on the bank and the defendant Schutte paid them and concealed the overdrafts by various false and fictitious book entries. Apparently her chief objectives in life were to keep the bank open under any conditions, to pay appellant's checks and to conceal his overdrafts. To accomplish these objectives she forged notes aggregating approximately $8,000, raised a note of $200 to $1,200, sold bonds of Billings County entrusted to the bank for safe keeping in the sum of $13,000 and used the money, made a false entry to show a credit of $2,300 that did not exist in another bank, embezzled $16,000 belonging to an estate, forged a bond to secure a deposit of $9,000, failed to register time deposit certificates aggregating approximately $8,000 and removed from the records of the bank individual ledger accounts amounting to a total of $51,443.50. Furthermore, she unlawfully abstracted and misapplied the funds of the bank, made numerous false entries and committed many forgeries and other violations of the law. The defendant Schutte pursued this course of conduct in the beginning she says because of her friendship for appellant and his family and because he was a man of large business affairs and financially able, as she believed, to meet his obligations. Later, when she realized that he was in financial difficulties, she feared that he would expose her if she refused to continue the practice of paying his checks, as she believed that she had been guilty of violating the law and that he was innocent.

It is the theory of the government that the appellant aided and abetted the defendant Schutte in violating the law by drawing checks on the bank when he knew that his account was overdrawn and that he had no funds on deposit with which to pay them, and that the defendant Schutte would pay them and, by false credits and by failing to charge such checks to his account and by misapplication of the funds of the bank, would keep his overdrafts concealed. The checks specified in counts 2 to 32 of the indictment were drawn, presented to and cashed by the bank during the period from January 1, 1936, to the date the bank was closed.

The contentions of appellant may be classified, as follows: (1) That the evidence is insufficient to sustain the verdict, assignment of error 16; (2) that the instructions of the court to the jury were erroneous, assignments of error 14 and 15; (3) that the court received inadmissible evidence over the objection of appellant, assignments of error 1 to 13 inclusive; and (4) that a communication between the jury and a deputy United States Marshal was prejudicial to appellant, assignments of error 17 and 18. We will consider these propositions in the order stated.

There is little controversy about the facts in this case except as to whether appellant had an overdraft in the bank and knew it at the time he drew and delivered the various checks specified in the indictment and that his codefendant would use the funds of the bank to pay them.

The defendant Schutte admitted her guilt in all respects and related in her testimony how for a period of many years appellant had overdrawn his account and how the deficit had increased with the years. She stated that she often throughout the period discussed the situation with him, that he promised to use the money from the sale of a mine, from his mother's estate and from other sources to repay the bank, but that he always failed to do so. She testified that she had concealed the overdrafts of appellant by not charging many of his checks on the bank to his account and by entering fictitious credits in his favor, and that she commenced this practice in 1924 or 1925. She estimated his total overdraft at the time the bank closed at approximately $30,000. Counsel for appellant calls her story unbelievable. It does seem almost incredible that a banking institution could be operated with such extreme crudity under modern surveillance and escape for fourteen years. However, there is much corroborative evidence.

It is appropriate to observe some of the outstanding features that were revealed by the books and records of the bank. They were examined and analyzed by two experienced accountants, one of whom had devoted eight months to the work. For convenience the accountants divided the period from January 1, 1931, to September 24, 1938, into three subdivisions: In the first, 1931 to 1935 inclusive, appellant's overdraft was $6,680.65; in the second, May 24, 1933, to January 1, 1935, no overdraft was shown because of insufficient records; and in the third, May 1, 1936, to September 24, 1938, the overdraft was $9,045.28. The overdraft for the entire period, less the nineteen months from May 24, 1933, to January 1, 1935, was $15,925.93. It was found that the overdraft consisted of three classes of items: (a) Checks paid to the bank but not charged to appellant's account; (b) credits appearing on the ledger sheets of appellant's account but for which there were no deposits; and (c) errors in carrying forward balances and in posting checks and deposits. The overdraft was determined by deducting the verified charges, those supported by cancelled checks, from the actual deposits, those supported by deposit slips or journal entries.

The books revealed false credits for the years 1924 to 1930 inclusive of $4,439.30 and for the period May 24, 1933, to January 1, 1935, to $2,319.48. If these two items were added to the overdraft above mentioned, the total is increased to $22,684.71. The total of checks paid but not charged to appellant's account for those two periods was not determined because the checks were not available. Appellant from 1931 to 1938 inclusive, excluding the period of nineteen months, drew checks on his account amounting to $41,009.93 and deposited during that time $26,656.96. In addition to the overdraft he was indebted to the bank on notes aggregating $4,086.85.

The government offered in evidence the books and records of the bank, cancelled checks drawn by appellant against his account but not charged against it, entries showing arbitrary credits made to his account for which there were no deposit slips or journal entries. The books and records themselves showed that many entries were false and did not correctly re-

cite actual transactions. By a process of "reconstruction," accountants undertook to show the true condition of appellant's account in the bank. The reconstruction was based on the assumption of facts supported by evidence supplementing the books and records revealing the true situation between the bank and appellant. When the truth was thus developed it showed a large overdraft, when the books and records as kept showed little or no part of it.

The defendant denied that he had any knowledge that his account was overdrawn during the years he was a depositor at the bank, except on a few occasions when he was notified of small overdrafts that he immediately paid. He denied that his codefendant Schutte notified him of large overdrafts, or of her efforts and methods to conceal them, and that he promised to use funds from various sources to repay them. He claimed that he had not kept books, had no record of his bank balances, and much of the time had not received the customary statements from the bank. The stupidity of his business methods appears to have been equalled only by those of the bank.

■ In addition to the testimony of the defendant Schutte, the two accountants and the records of the bank, there was other corroborative evidence that made a prima facie case for the jury. The evidence offered by the government, if believed by the jury, was ample to prove guilt beyond a reasonable doubt. Therefore, the first contention of appellant cannot be sustained.

■ It is contended that the court erred in charging the jury that the defendant Schutte had entered a plea of guilty and in failing to charge the jury that before they could find appellant guilty of aiding and abetting the defendant Schutte it was necessary for them to find beyond a reasonable doubt that she was guilty as alleged in the indictment. At the conclusion of the charge the court expressly inquired whether there were any exceptions and whether further instructions were desired. Counsel for appellant answered in the negative. It is the duty of the defendant to take exceptions to the charge of the court or to request additional instructions before the jury retires to consider the case. Jenkins v. United States, 4 Cir., 58 F.2d 556, certiorari denied 287 U.S. 622, 53 S.Ct. 21, 77 L.Ed. 540; Booth v. United States, 10 Cir., 57 F.2d 192; Elderd v. United States, 4 Cir., 44 F.2d 170. Where prejudicial error is obvious in a criminal case, appellate courts should of their own motion recognize it and give protection against an unlawful conviction. Booth v. United States, supra; Danaher v. United States, 8 Cir., 39 F.2d 325. In the Booth case the court held that an instruction as to the disposition of the case against codefendants was not prejudicial and did not constitute a ground for reversal. In this case the defendant Schutte testified that she was guilty and that she had entered a plea of guilty. The evidence showing her guilt was so overwhelming that it would seem only supererogation to require the jury to find her guilty and to instruct accordingly. The objections now made to the instructions did not result in a miscarriage of justice in this case and do not justify a reversal, especially in the absence of exceptions to the charge as given and a request for instructions desired.

■ Appellant contends that there was error in admitting certain testimony. A statement prepared by an accountant was received in evidence but it contained data taken from the records of the bank that were in evidence and were available to counsel for appellant, with calculations and explanations made by the accountant of the bookkeeping methods, the meaning of certain entries and what the records did or did not reveal. Such records often are unintelligible to persons inexperienced in bookkeeping and interpretation by an accountant is essential to the understanding of a jury. It sometimes is difficult to distinguish between what is an interpretation or an explanation and what is an opinion or a conclusion. In this case it was not prejudicial or improper to receive the statements and explanations that were necessary to an understanding of the records and the calculations of the accountants based on entries contained in the records.

■ The defendant Schutte was permitted to say that appellant was under "financial stress," meaning that he was in need of money. Such testimony was material and competent as it revealed the motive of appellant for aiding and abetting the defendant Schutte in the commission of the crimes alleged. Undoubtedly, she knew the financial circumstances of the

appellant thoroughly. Likewise, the testimony showing the various accounts in the bank in which he was interested and the evidence pertaining to the condition of his account in the bank from 1931 to 1936 was entirely material and competent.

It is true that some of the questions were leading, that some of the answers are in the nature of opinions and conclusions, and that some of the objections made by counsel for appellant very properly might have been sustained; but, on the whole, the record shows conclusively that there was no error in the reception of testimony resulting in a miscarriage of justice. When the character of the case is taken into consideration, the record is comparatively free from prejudicial evidence.

There was a communication between the jury and a deputy marshal that appellant contends was prejudicial and prevented a fair trial. Affidavits of three jurors who served in the case were filed in support of a motion for a new trial which was based on the irregularity. These affidavits are substantially alike and recite that after the case was submitted to the jury and after it had deliberated for about twenty-three hours the jury through a deputy marshal, not a bailiff in charge of the jury, requested information from the trial judge concerning a recommendation of leniency; that the deputy marshal after conferring with the trial judge returned and stated that such a recommendation would be proper, that the judge would act on it, and that said jurors believed that leniency accordingly would be shown. The verdict was returned November 8, 1939. Two of the affidavits were dated January 6, 1940, and one January 8, 1940. The affidavit of an attorney for appellant dated March 18, 1940, also was filed in which he stated that the irregularity did not come to the attention of appellant or his counsel until after time for a motion for a new trial under the rule of the court had expired.

The government in opposition to the motion filed affidavits of the deputy marshal and three of the jurors. The deputy marshal stated that the bailiff in charge of the jury informed him that the jury desired to know whether it was proper for them to recommend leniency; that he went into the jury room and certain of the jurors inquired whether they would be permitted to include a recommendation of leniency with their verdict; that the door was open and the bailiff was at the door; that he informed them that he would communicate with the judge if they desired that he do so; that at their request he reported the question to the judge, who said that the jury could recommend leniency if they desired, but that such recommendation should be on a separate sheet of paper; "that the court did not state, nor did affiant inform the jury, that such recommendation would be acted upon by the judge; that affiant returned to the jury room and informed the jury that the court had advised him that the jury might recommend leniency and that said recommendation should be on a separate sheet of paper and not on the verdict form"; that there was no further communication between him and the jury and that the jurors did not discuss the case in his presence.

The affidavits of the three jurors filed by the government are substantially alike. They said that the matter of leniency was considered "after they had agreed upon a verdict of guilty in the case"; that one of the jurors asked a bailiff to ascertain from the judge whether they could make such a recommendation; that the deputy marshal told them that they would be permitted to do so but that it should be on a separate paper. The affidavit of one juror, more in detail, recited that "the jury unanimously agreed upon a verdict of guilty, that thereafter the jurors were in doubt whether they could lawfully recommend leniency"; that the deputy marshal after the inquiry was made "returned and reported that he had discussed the matter with the judge and gave the jury to understand that the judge would not be offended if clemency were recommended"; that thereupon the jury prepared a written recommendation of clemency which was returned in open court with the verdict.

The motion for a new trial was denied by the court. In a memorandum the court said that at the time the inquiry concerning leniency was made the jury completely and finally had concluded all its deliberations and had found the defendant guilty; that the only function that remained was to return the verdict into court and that the communication therefore was not prejudicial to the defendant.

It is significant that the affidavits filed in support of the motion do not state that a verdict had not been reached at the time of the communication. Apparently, there

is no basis for the contention that the communication influenced the jury or led to the verdict of guilty. The most that can be said by appellant is that the jurors desired to make a recommendation of leniency when the verdict was returned but were uninformed as to whether it would be proper for them to do so, and the inquiry was to ascertain whether such recommendation would be proper.

■■ A motion for a new trial based on newly discovered evidence was not within the time prescribed by the rule. The motion in this case was not based on newly discovered evidence, but the record reveals an irregularity that deserves attention. Communications between the court and the jury pertaining to a case that has been submitted should take place only in open court in the presence of counsel for the respective parties; and, in a criminal case, in the presence of the defendant if he is charged with a felony unless he voluntarily absents himself from the trial. Fillippon v. Albion Vein Slate Company, 250 U.S. 76, 39 S.Ct. 435, 63 L.Ed. 853; Ah Fook Chang et al. v. United States, 9 Cir., 91 F.2d 805; Fina v. United States, 10 Cir., 46 F.2d 643. The jury system is founded on the theory that disinterested jurors will hear the evidence in open court and on that evidence alone deliberate among themselves until a verdict is reached. Private communications, even though harmless in themselves, may open the way to abuses and may destroy confidence in legal procedure and the judiciary. Therefore, it is improper for the judge to hold any important communication with the jury concerning the case unless openly and with opportunity to the accused to be present and to object and to take exceptions.

■ However, if the record shows affirmatively that appellant was not prejudiced, then the error does not require reversal. Outlaw v. United States, 5 Cir., 81 F.2d 805; Little v. United States, 10 Cir., 73 F.2d 861, 96 A.L.R. 889; Ah Fook Chang v. United States, supra; Philadelphia & R. Ry. Company v. Skerman, 2 Cir., 247 F. 269; Dodge v. United States, 2 Cir., 258 F. 300; Sandusky Cement Company v. A. R. Hamilton & Co., 6 Cir., 287 F. 609. In the case under consideration it affirmatively has been shown that a verdict had been reached before there was any communication between the jury and the deputy marshal, that the verdict was not conditional on the opportunity of the jury to recommend leniency or any promise by the court that such recommendation would be followed. In other words, the verdict was not the result of any bargain between the court and jury. Consequently, the appellant was not prejudiced by the communication. If there was any evidence of a substantial nature that the communication influenced the jury or in any respect was prejudicial to the appellant, there should be a reversal, but the record in this case convinces us that the incident was harmless.

A careful consideration of the contentions of the appellant and a painstaking examination of the record do not reveal prejudicial error, and the judgment therefore is affirmed.