Lawrence **RICE** and **Walter Chipman,**
**Appellants,**

v.

**UNITED STATES of America,**
**Appellee.**

No. 17933.

United States Court of Appeals
Eighth Circuit.

Feb. 28, 1966.

Herbert M. Wachtell, of Wachtell, Lipton, Rosen, Katz & Kern, New York City, made argument for appellants and filed brief with James J. Courtney, Jr., Duluth, Minn., Victor G. Hanson, Detroit, Mich., Don C. Miller, Cleveland, Ohio, and Alfred J. Weinberg, Duluth, Minn.

Sidney P. Abramson, Asst. U. S. Atty., Minneapolis, Minn., and Patrick J. Foley, Asst. U. S. Atty., Minneapolis, Minn.,

made argument for appellee and filed brief.

Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

Defendants, Lawrence Rice and Walter Chipman, were convicted by a jury on Count II of a multicount indictment charging conspiracy to intimidate and impede witnesses in a proceeding before the National Labor Relations Board by the use of threats and force in violation of 18 U.S.C.A. §§ 371 and 1505.[1] Co-defendants Kevin Ryan and Donald Bensman were acquitted on all counts. Count II specifically noted twenty-three overt acts of intimidation of Edward Jameros, William Babbitt and Charles Corlett, commencing July 1, 1962 and continuing through October 4, 1962. The alleged acts ranged from telephone threats to physical assaults on the persons of Jameros, Corlett and Albert Shinski.

The record evidence comprises several volumes despite the absence of any testimony or evidence in behalf of defendants. A complete summary is unnecessary and we recite only the salient facts.

Rice was a patrolman for the Atlantic, Gulf, Lakes and Inland Waters District of the Seafarers International Union (SIU). Ryan was an organizer and Bensman was Duluth port agent for the SIU's Great Lakes District beginning August, 1962. Chipman, Jameros, Babbitt, Corlett and Shinski were all seamen and members of the Great Lakes District of SIU.

On July 23, 1962, Jameros and Babbitt filed individual charges with the NLRB

1. 18 U.S.C.A. § 371:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

18 U.S.C.A. § 1505:

"Whoever corruptly, or by threats or force, or by any threatening letter or

communication, endeavors to influence, intimidate, or impede any witness in any proceeding pending before any department or agency of the United States, or in connection with any inquiry or investigation being had by either House, or any committee of either House, or any joint committee of the Congress * * *.

\* \* \* \* \*

"Shall be fined not more than $5,000 or imprisoned not more than five years, or both."

against Dunbar and Sullivan Dredge Company and the Inland Boatmen's Union (IBU), asserting discrimination in shipping assignments. In "early August" Babbitt was visited at his home in Duluth by Rice, Chipman and a man known only to Babbitt as "Smoky". Babbitt "wasn't exactly asked to drop the charge," but either Rice or Chipman "said it looked like kind of bad publicity * * for the union, brother members fighting amongst theirselves and internal arguments and stuff like that."

On August 4, 1962, Chipman telephoned Jameros in Duluth and asked that he drop his charges. Chipman added that the IBU was upset about the charges and that if Jameros would go to Detroit and contact a certain SIU official, Jameros might "get a ship out of it."

On August 8, 1962, following a conference with union officials and a representative of the NLRB, both Jameros and Babbitt withdrew the charges upon assurance by the NLRB representative that the papers would be kept in a closed file and could be reinstated at some future date if desired.

In "mid-September" of 1962, Chipman, Rice and Ryan visited Corlett in the latter's home. Corlett indicated he might go to the Labor Board in an effort to get back on the dredges and was advised by Chipman that "it wouldn't be very smart to go to the Labor Board." The conversation was animated and without threats.

Evidently feeling that they were continuing to be passed over for jobs in favor of IBU members, Jameros and Corlett filed additional charges with the NLRB on September 26, 1962. These later charges were withdrawn on October 11, 1962 after Jameros and Corlett were brutally assaulted at the union hall in Duluth, Minnesota on October 1.

On September 30, 1962, four days after Jameros and Corlett filed the later charges, Rice and Chipman, accompanied by Dale Lucia, drove from Alpena, Michigan to Duluth, Minnesota, for the ostensible purpose of picketing a Hanna Company ship, the *Weir*.[2] The trio registered at a hotel in Duluth and the next morning, October 1, met with Ryan and Bensman who accompanied them to Superior, Wisconsin to search for the *Weir*. Finding neither the *Weir* nor any other Hanna vessel, the group returned to Duluth where they shot pool and went to a movie before going to the union hall about 6:00 p. m. Rice, Chipman and Lucia remained in an unlighted area adjacent to the hall while Ryan attended and Bensman officiated.

Without relating the specific statements, at least an inference arises indicating that special efforts were made to see that Jameros and Corlett were in attendance. At the meeting a discussion began concerning seamen filing charges with the NLRB. It soon turned into a heated argument with Ryan cursing Corlett for taking his grievances to the Labor Board and concluding with Ryan knocking Corlett to the floor where "they put the boots to [him]." Jameros was hit in the face by Rice who along with Chipman and Lucia had entered from the adjacent room. Jameros saw the blow coming and ascertained that Rice had a metal band around his hand. About this time, someone yelled, "brass knucks." Jameros regained consciousness in a Duluth hospital an hour and ten minutes after the blow. Rice was heard to remark, "[t]his is what's going to happen to any finks that goes before the National Labor Board with any beefs. The SIU will handle their own beefs." Rice, Chipman and Lucia then drove nonstop back to Alpena, Michigan.

The intimidation that previously had been confined to suggestive threats ripened into brutal force and undoubtedly resulted in the accomplishment of its purpose, for thereafter on October 11, 1962 Jameros and Corlett withdrew the charges filed with the Labor Board.

In the interim Chipman, on October 4, hit Shinski who had also been complain-

2. Dale Lucia, also a seaman and member of the Great Lakes District of the SIU, was named as a coconspirator but was not indicted.

ing of being passed over in job assignments and who had attended the original meeting that resulted in withdrawal of the first two charges. Shinski received a cut over his eye requiring several sutures.

Jameros withdrew his charges because "[he] was scared, and * * * wanted to get enough time * * * [to] get out, take [his] family out, and try to protect [himself] and family as much as possible."

Corlett, who was a reluctant witness, was also afraid when he accompanied Jameros to the hospital after the attack in the union hall. He made efforts to obtain a gun permit through an enforcement officer for the NLRB and when advised that this would be impossible, Corlett refused to relate the details of the fistic encounter and the following day withdrew his charges.

■ Since withdrawal of the second charges, no further action was presented to or taken by the Labor Board. A crucial question is presented as to whether, within the meaning of § 1505, there was a proceeding pending before the Labor Board, so as to constitute a basis for criminal indictment. For reasons hereinafter stated, we hold that there was a proceeding pending before the Labor Board.

Defendants argue that the indictment does not allege an offense, as only a charge, as opposed to a formal complaint by the general counsel, had been filed before the Labor Board; thus, it is maintained there was no "proceeding pending" before the Board.

The Government counters with the assertion that the Board's regulations demonstrate that a "proceeding" was pending and additionally submit that the requirement of a pending proceeding under § 1505 is not applicable since the defendants were convicted for a conspiracy to violate the criminal statute rather than the substantive crime.

■ On this issue, the answer lies in the meaning of the term "proceeding" as used by the Congress in the enactment of § 1505. In construing statutes, this court will give the words of the statute their plain meaning unless there is a compelling reason to ascribe some different meaning to the language used by Congress. We said in Sternberg Dredging Co. v. Walling, 158 F.2d 678, 681 (8th Cir. 1946):

"In the interpretation of a statute its words are to be taken according to the meaning given them in common useage, unless to do so produces an absurd result or one which defeats the purpose for which the Act was passed."

■ "Proceeding" is a comprehensive term meaning the action of proceeding—a particular step or series of steps, adopted for accomplishing something. This is the dictionary definition as well as the meaning of the term in common parlance.[3] Proceedings before a governmental department or agency simply mean proceeding in the manner and form prescribed for conducting business before the department or agency, including all steps and stages in such an action from its inception to its conclusion.

■■ In our view, it would be absurd to hold that Congress meant to proscribe interference with the administrative process only after a Labor Board proceeding had reached a certain formal stage and let go unpunished individuals who obstruct earlier preliminary proceedings by frightening witnesses into withdrawing charges out of fear for their lives. Congress clearly intended to punish any obstruction of the administrative process by impeding a witness in any proceeding before a governmental agency—at any stage of the proceedings, be it adjudicative or investigative. Congress did not limit the term "proceeding" as used in § 1505 to only those acts committed after a formal stage was reached, and we cannot so limit the term.

It is singular to note that the Labor Board's regulations refer to its investiga-

3. See Webster's Third New International Dictionary.

tive aspects as being "proceedings." The pertinent language of the regulations is *"in the investigation and in all other stages of the proceedings * * *."* Rule 29 C.F.R. 101.4 (emphasis supplied)

Governmental agency proceedings frequently embrace both investigative and adjudicative proceedings. This is referred to by the Supreme Court in Hannah v. Larche, 363 U.S. 420, 446, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). The issue here was not present in Hannah, but it is noted that Chief Justice Warren referred to both investigative and adjudicative actions as being "proceedings."

Defendants point out that some courts, e. g. United States v. Scoratow, 137 F. Supp. 620 (W.D.Pa.1956), have held that to constitute an offense under 18 U.S.C.A. § 1503, the act must relate to a proceeding pending in the federal courts— and that a proceeding is not pending in the federal courts until a formal complaint has been filed with the United States commissioner.[4] Reference to the procedures before the Labor Board and a United States court readily discloses that cases dealing with § 1503 do not answer the question of when a Labor Board proceeding becomes pending. A formal complaint is necessary to commence proceedings before a federal court. Such is not the case with proceedings before the Labor Board. The Labor Board regulations, 29 C.F.R. 101.2 et seq., provide for the initiation of an unfair labor charge case by a filing of a charge in writing with the regional director. The charge must be signed and sworn to be true. The charge must contain a statement of facts constituting the alleged unfair labor practices. When the charge is received in the regional office, it is filed, docketed and assigned a case number. A copy is served upon the person against whom the charge is made. The regional director then requests the charging party to promptly submit evidence in support thereof and the charged party is asked to submit a statement of his position. Then the case is assigned to a member of the field staff for investigation. If the investigation reveals no violation or an insufficiency of evidence, the regional director recommends withdrawal. If the charging party refuses to withdraw, the regional director dismisses the charge, whereupon the charging party has the right to appeal to the general counsel in Washington, D. C. Thereupon the entire file is sent to Washington for review. The general counsel may sustain the regional director or remand and direct him to take further action. Before issuing a formal complaint, the regional director affords all parties an opportunity to make offers of settlement or proposals of adjustment. Normally, at this stage, prehearing conferences are held and if efforts to dispose of the case by informal adjustment are unsuccessful, the regional director may institute formal action by issuance of a formal complaint and notice

4. 18 U.S.C.A. § 1503.

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

of a hearing thereon. Even after issuance of the formal complaint, the parties are afforded full opportunity to dispose of the case by amicable adjustment.

Fed.R.Crim.P. 3 describes a complaint before a commissioner as follows:

"The complaint is a written statement of the essential facts constituting the offense charged. It shall be made upon oath before a commissioner or other officer empowered to commit persons charged with offenses against the United States."

Thus, it is seen that there is no material difference between a complaint filed with the United States commissioner and an unfair labor charge filed with the Labor Board. Each is a written statement of the essential facts constituting the offense charged. Each is made upon oath. The Labor Board charge is docketed, given a case number, served on the opposing party, and both parties requested to present relevant evidence. The filing of the formal complaint with the commissioner and the filing of the unfair labor practice charge with the Board are followed by investigative procedures. If the filing of the complaint initiates a proceeding in the court, then most certainly the filing of an unfair labor charge commences a proceeding before the Labor Board.

The precise issue here apparently has never been squarely passed upon by any court. The case of Pettibone v. United States, 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419 (1893), has been cited, but as Judge Biggs said in United States v. Perlstein, 126 F.2d 789, 794 (3rd Cir. 1941), cert. denied, 316 U.S. 678, 62 S.Ct. 1106, 86 L.Ed. 1752 (1942): "In the *Pettibone* case a proceeding was pending and the pendency or non-pendency of a proceeding was not an issue."

We have read with interest the numerosity of cases cited by the parties but find none controlling. Most of them deal with § 1503. As has been indicated, the filing of a charge before the Labor Board is the practical equivalent to the filing of formal complaint with a United States com-

missioner. Thereafter, the procedures differ by reason of the opportunity afforded the parties in labor cases for conciliation of their differences in order to bring about an amicable settlement. In any event, if any § 1503 case could be construed to conflict with our holding here, we would not choose to follow it.

The case of Taran v. United States, 266 F.2d 561 (8th Cir. 1959), involves § 1505, but it neither supports defendants' argument nor conflicts with the conclusion we reach here. *Taran* was a two-pronged case as one count involved a deportation proceeding and another related to a naturalization proceeding. Nothing in the deportation proceeding has any remote bearing on the issue here. On the naturalization proceeding, this court held that if any proceeding was pending at all, it was a proceeding pending only in Florida. This is a venue question having no relevance to the instant case. Additionally, however, this court held that there was no proceeding pending in 1955 merely because a preliminary and incomplete application for naturalization had been filed in 1951 and returned in 1951 with the request that it not be submitted until all required documents accompanied it. Both the agency and the agent regarded the preliminary and incomplete application as not having ever been submitted, and accordingly, this court held there was no proceeding pending before the Immigration and Naturalization Service at the time of the charged offense.

United States v. Batten, 226 F.Supp. 492 (D.D.C.1964), cert. denied, 380 U.S. 912, 85 S.Ct. 898, 13 L.Ed.2d 799 (1965), is perhaps the closest of kin from a factual standpoint to the case at bar. There, the defendant was charged under § 1505 with interference with a witness before a Securities and Exchange Commission investigative proceeding. In denying defendant's motion for acquittal, Judge Holtzoff noted at pages 493–494:

"The Court is not unmindful of the doctrine that a criminal statute should be strictly construed. There is, however, a corollary to that prin-

ciple, namely, that even a criminal statute should not be interpreted so narrowly as to defeat the purpose and intent of the legislative body that enacted it.

"The word 'proceeding' is a term of very broad scope. For example, a preliminary hearing before a United States Commissioner is a proceeding, even though there has been no indictment as yet. The statute authorizing the action taken by the Commission specifically empowers investigations to be conducted and witnesses to be sworn at such investigations. This is more than a mere police investigation, as counsel has termed it. To say that a person may not be punished under this statute for inducing a witness to commit perjury at such an investigation, in which an oath is administered by authority of law, and to limit the statute only to formal hearings before an Examiner or a member of the Commission, would defeat a part of the purpose of Congress.

"The Court, therefore, reaches the conclusion that the term 'proceeding' as used in 18 U.S.C. § 1505, should be construed broadly enough to include any investigation directed by a formal order of the Commission, at which a designated officer takes testimony under oath.

\* \* \*

"Section 1505 prohibits any endeavor to influence, intimidate or impede any witness in any proceeding before any department or agency of the United States. This provision is broad enough to cover any activity which would influence or intimidate a witness who might be called to testify; it is not limited to a witness who has been called to testify under oath and to a case in which the defendant knew that particular fact."

Since we rule that there was a proceeding pending here before the National Labor Relations Board, it is unnecessary to reach or discuss the Government's theory based upon United States v. Perlstein, supra, that the statutory requirement of a pending proceeding under the substantive act is not required by the conspiracy statute.

The next question we consider and that upon which we reverse involves a communication between the judge and the jury after submission of the case to the jury and during its deliberations. Neither defendants nor their counsel were present nor were they advised that the jury had requested additional instructions.

The affidavits filed in support of defendants' motion for a new trial revealed that after receiving the case on Friday afternoon, June 5, 1964, the jury was still in deliberation and apparent deadlock on either Saturday afternoon or Sunday morning. Subsequently a note was prepared by the foreman and delivered by the bailiff to the judge in his chambers. The note inquired if the jury could be "undecided" as to certan counts, to which the bailiff orally relayed the judge's answer that defendants must be found either guilty or not guilty on each count.

The transmission of the note and the substance of the bailiff's oral reply are not contested; rather the Government argues that the communication did not prejudice defendants as it did not induce the jury's verdict. Support for this contention is begged by the jury's failure to resolve its differences as deliberations continued until noon Sunday, June 7, when, still being hung, the jury was called into court and in the presence of defendants and counsel given an alleged "Allen plus" instruction which did effect a verdict within approximately one and one-half to two hours.[5]

Defendants rely on Shields v. United States, 273 U.S. 583, 47 S.Ct. 478, 71 L.Ed. 787 (1927), as standing on all fours with the case at bar. In Shields,

5. Allen v. United States, 164 U.S. 492, 501–502, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

the jury sent the following communication to the judge in chambers:

> "We, the jury, find the defendants John G. Emmerling, Charles Lynch not guilty on all counts. E. W. Hardison, J. E. Hunter, and J. L. Simler guilty on all counts. Daniel J. Shields, Harry Widman, J. M. Gastman unable to agree.
>
> [Signed] E. B. Milligan, Foreman."

Id. at 584, 47 S.Ct. at 478.

The judge from his chambers sent back the following written reply:

> "The jury will have to find also whether Shields, Widman, and Gastman are guilty or not guilty.
>
> F. P. Schoonmaker, Judge."

Id. at 584, 47 S.Ct. at 478.

These communications were not made in open court and neither Shields nor his counsel was present. "Shortly after," the jury returned a verdict of guilty as to Shields and the other two petitioners about whom there had been no original agreement.

The Government was unable to find any satisfactory ground for opposing petition for writ of certiorari and filed no brief in opposition.

The following language was quoted from Fillippon v. Albion Vein Slate Co., 250 U.S. 76, 81, 39 S.Ct. 435, 63 L.Ed. 853 (1919):

> " 'Where a jury has retired to consider of its verdict, and supplementary instructions are required, either because asked for by the jury or for other reasons, they ought to be given either in the presence of counsel or after notice and an opportunity to be present; and written instructions ought not to be sent to the jury without notice to counsel and an opportunity to object.' " 273 U.S. at 588, 47 S.Ct. at 479.

The Court then concluded:

> "If this be true in a civil case, *a fortiori* is it true in a criminal case? The request made to the court jointly by the counsel for the defendant and for the government [to the court] did not justify exception to the rule of orderly conduct of jury trial entitling the defendant, especially in a criminal case, to be present from the time the jury is impaneled until its discharge after rendering the verdict." 273 U.S. at 588–589, 47 S.Ct. at 479.

The judgment was reversed without reference to the other assignments of error which included that the instruction communicated to the jury that petitioners must be found either guilty or not guilty was erroneous, and that the direction to the jury to bring in a verdict of guilty or not guilty as to the three defendants named had the effect of coercing the jury into rendering a verdict which they were plainly reluctant to return.

Defendants claim that because the Court in *Shields* reversed solely on the ground that petitioner and his counsel were absent when a communication passed from the judge to the jury we should likewise refuse any consideration of whether defendants were, in fact, prejudiced, and hold as a matter of law that such communications amounted to the "denial of a right so fundamental as necessarily to affect the substantial rights of the defendant regardless of the nature or propriety of the instruction given." Arrington v. Robertson, 114 F. 2d 821, 823 (3rd Cir. 1940); Snyder v. Lehigh Valley R. R., 245 F.2d 112 (3rd Cir. 1957); Jones v. United States, 308 F.2d 307 (1962); accord, Smith v. Ellerman Lines, 247 F.2d 761, 765 (3rd Cir. 1957); cf. United States v. Kram, 247 F.2d 830 (3rd Cir. 1957); Walker v. United States, 116 U.S.App.D.C. 221, 322 F.2d 434, 435–436 (D.C.Cir.1963), cert. denied, 375 U.S. 976, 84 S.Ct. 494, 11 L.Ed.2d 421 (1964).

■ It cannot be gainsaid that it constitutes error for a trial court in a criminal case to instruct the jury outside the presence of a defendant and his counsel. However, most courts now hold that the presumption of prejudice resulting from

such error is a rebuttable one and in some instances may be overcome by evidence giving a clear indication of lack of prejudice.[6] This court has consistently followed this rule. In Chambers v. United States, 237 F. 513 (8th Cir. 1916), a deputy marshal answered the jury's inquiry concerning the normal penalty following a recommendation of mercy. We held that:

"* * * [T]he stronger reasons and the weight of authority sustain the rule that, where a motion for a new trial is made on account of communications to the jury during their deliberations, there is a rebuttable legal presumption that they were prejudicial to the moving party, that this presumption may in some cases be overcome by evidence, and that where competent evidence is offered it is the duty of the trial court to hear and consider it, and that when it does so, and decides the motion thereon, its decision is discretionary, and is reviewable by a federal appellate court for abuse of discretion only." Id. at 521.

A new trial was denied as the Government was able to produce substantial evidence that defendant was not prejudiced by showing that the jury's verdict had been reached *before* the statements by the deputy marshal. Mattox v. United States, 146 U.S. 140, 148–150, 13 S.Ct. 50, 36 L.Ed. 917 (1892); Wheaton v. United States, 133 F.2d 522 (8th Cir. 1943); accord, Ray v. United States, 114 F.2d 508 (8th Cir. 1940), cert. denied, 311 U.S. 709, 61 S.Ct. 318, 85 L.Ed. 461 (1940).

■ In the instant case, the Government produced no evidence or affidavits to show that defendants were not prej-

udiced by the judge's instruction made in their absence. Rather, the Government offers the record, comprising some two thousand pages, for our examination in apparent hope that we will provide that which it failed to produce when the hearing was had on the motion for new trial. We have carefully canvassed the record and find nothing therein remotely indicating a lack of prejudice.

As for the Government's argument that the statements were not coercive and, therefore, did not affect the verdict, we find little merit. See Jenkins v. United States, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965). In *Jenkins*, after slightly more than two hours' deliberation, the jury advised the trial judge that it was unable to agree "on both counts because of insufficient evidence." The judge recalled the jury and in the course of his response stated, "You have got to reach a decision in this case."[7] The instruction was given in open court in the presence of defendant and his counsel after which the jury retired to their homes overnight and continued deliberating the next morning before reaching a verdict. The Supreme Court, per curiam, held "upon review of the record, we conclude that in its context and under all the circumstances the judge's statement had the coercive effect attributed to it." In the case at bar, the jury deliberated for a considerable length of time and returned a verdict only after the "Allen plus" instruction had been given. We are not clairvoyant and have no way of knowing the effect of the judge's communication with the jury. This was a multicount indictment, and, for all we know, the jury could have been in disagreement as to Count II—the count upon which the guilty verdict was re-

6. For discussion of Fed.R.Crim.P. 43 and 52(a), see Walker v. United States, supra, and cases there cited. *Walker* points out that "[p]ractically all cases holding that a violation of Rule 43 is reversible error involved situations where it was decided there was resultant prejudice or a reasonable possibility thereof."

Id., 322 F.2d at 435–436. (Citing *Shields.*)

7. The complete instruction given by the trial court is found in Judge Wright's dissent, 117 U.S.App.D.C. 346, 330 F.2d 220, 221 (1964).

turned.  We will not second-guess the jury.

Since our reversal requires a new trial, it would serve no useful purpose to discuss other issues presented by this record.

The judgment is reversed and the cause is remanded for new trial.