NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0755n.06

No. 08-4214

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Dec 14, 2010**
LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,              )
                                       )
    Plaintiff-Appellee,            )
                                       )
v.                                     )   On Appeal from the United States
                                       )   District Court for the Southern
STEVEN P. PUGH,                        )   District of Ohio
                                       )
    Defendant-Appellant.           )

Before: KEITH, BOGGS, and McKEAGUE, Circuit Judges.

BOGGS, Circuit Judge. Steven Pugh, a former warehouse manager at Berkeley Premium Nutraceuticals, Inc. ("Berkeley"), was convicted of conspiracy to obstruct a Food and Drug Administration ("FDA") inspection, in violation of 18 U.S.C. §§ 371 and 1505. In this appeal, Pugh argues that his conviction should be reversed, claiming that the government failed to introduce sufficient evidence that he knowingly entered into an agreement to impede the FDA's efforts. He also argues that the evidence was insufficient because the FDA inspection was not an agency "proceeding" for purposes of 18 U.S.C. § 1505. In addition, he claims that the district court's jury instructions were inadequate in light of their failure to define the term "proceeding." Pugh also claims that the district court made a number of erroneous evidentiary rulings. Finally, Pugh contends that the district court erred in refusing to grant him a new trial based on prosecutorial misconduct. For the reasons that follow, we affirm Pugh's conviction.

I

On May 12, 2004, Roy Stephens, an FDA inspector, appeared unannounced at Berkeley's offices in Blue Ash, Ohio. Berkeley was a distributor of herbal supplements, and Stephens had come to gather information on the company's practices and take samples of its products. Upon entering the company's headquarters, Stephens asked to speak with "the most responsible person" and eventually met with Steven Warshak and Paul Kellogg, the owner and general counsel of Berkeley, respectively. Stephens presented Warshak with a notice of inspection and explained that the FDA would need to take a look around. After gathering certain "administrative data," Stephens indicated that FDA agents would also need to inspect the areas in which Berkeley stored its products. He was told that the products were kept in two warehouses, one on Duff Road, and the other on Cornell Road. It was agreed that the FDA would inspect the facilities on the following day.

After Stephens left, Kellogg gathered a number of Berkeley executives to discuss the impending inspection of the warehouses. According to James Teegarden, one of the executives present at the meeting, Kellogg indicated that "the FDA agent was going to go to the warehouse and review all of the products and check labeling and the like." This caused a measure of alarm among the executives, who thought that one of the warehouses contained mislabeled boxes of Rovicid, a supplement that was advertised to promote heart health.[1] To ensure that the FDA did not stumble

---

[1]Rovicid was originally formulated to promote prostate health. However, lagging sales prompted the company to reformulate it—*i.e.*, change its ingredients—and market it as a heart-health product. When the change was made, however, myriad boxes of the old Rovicid remained. To avoid simply throwing the old Rovicid away, the company repackaged it as new Rovicid.

across any of the mislabeled Rovicid, the executives decided "to move [the] Rovicid out of the warehouse and basically hide it somewhere as quickly as possible."

Once the group disbanded, Greg Cossman, Berkeley's President, went to the Duff Road warehouse to speak with Pugh, who was in charge of the facility. According to Cossman, he "informed [Pugh] that there was an FDA inspection coming and [that they] needed to get rid of the Rovicid." Pugh replied, "Okay, I'll take care of it."

Following his conversation with Cossman, Pugh instructed several warehouse employees to load the mislabeled Rovicid onto a Penske rental truck before the end of the night. James Seiter, one of the employees, later testified that Pugh "told [him] . . . the FDA inspectors were coming." The next morning, around 7 o'clock, Pugh ordered another employee, James Kinmon, to "get the truck out of there and into—and drive it over to [another Berkeley site] and park it in the overflow lot." Pugh instructed him to do it "immediately." After the truck had been moved, Pugh met Kinmon in the overflow lot and drove him back to the warehouse.

That same morning, the FDA arrived, collected samples, and subsequently moved on to the remaining facilities. The inspection concluded within the next several days, and the Rovicid-laden rental truck was driven back to the Duff Road warehouse. Cossman, who had told Pugh to dispose of the Rovicid, later visited the warehouse and saw that "the Rovicid that was to be gotten rid of was [back]." According to Cossman, Pugh explained that "he had hidden [the Rovicid] on a rental truck and returned it back to the warehouse."

On September 27, 2005, more than a year after the FDA inspection, Pugh was arrested in the wake of a massive criminal investigation into Berkeley's business practices. On September 20,

2006, a grand jury sitting in the Southern District of Ohio returned a 112-count indictment against Pugh and several others. Pugh was charged with one count of conspiracy to commit misbranding, one count of misbranding, and one count of conspiracy to obstruct an FDA proceeding. In February 2008, following a seven-week trial, a jury acquitted Pugh of the misbranding charges but convicted him of conspiracy to impede the FDA inspection. After trial, Pugh moved for acquittal, but his motion was denied. He was later sentenced to one year and one day of imprisonment, to be followed by three years of supervised release. This timely appeal followed.

II

Pugh argues that the evidence at trial was insufficient to support his conviction for conspiracy to obstruct an agency proceeding. "Generally, when the sufficiency of the evidence is challenged on appeal, the standard of review is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Swidan*, 888 F.2d 1076, 1080 (6th Cir. 1989) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986) (citing *United States v. Stone*, 748 F.2d 361 (6th Cir. 1984)).

To establish that a defendant is guilty of conspiracy under 18 U.S.C. § 371, the government must prove three elements: "(1) the existence of an agreement to violate the law; (2) knowledge and intent to join the conspiracy; and (3) an overt act constituting actual participation in the conspiracy." *United States v. Blackwell*, 459 F.3d 739, 760 (6th Cir. 2006). "[P]roof of a formal agreement . . .

- 4 -

is unnecessary; a tacit or mutual understanding among the parties is sufficient to show a conspiracy."

*United States v. Lee*, 991 F.2d 343, 348 (6th Cir. 1993). Indeed, "[a] conspiracy may be inferred

from circumstantial evidence [that] may reasonably be interpreted as participation in a common

plan." *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002) (citing *United States v. Blakeney*,

942 F.2d 1001, 1010 (6th Cir. 1991)).

## A

Pugh argues that the government failed to prove that he knowingly joined a conspiracy to

obstruct the FDA inspection. He argues that he was merely "an unwitting pawn" in the hands of

Berkeley executives. Reply Br. at 9. He also claims that "there [was] no evidence that [he] had any

involvement in conversations, meetings or transactions relating to the illegal criminal activity."

Appellant's Br. at 21. In sum, he argues that there is nothing in the record to suggest that he knew

the Rovicid needed to be moved because of the looming inspection.

However, that is simply not the case. Cossman testified that he told Pugh to get rid of the

Rovicid so that the FDA would not find it.[2] Thus, there is competent evidence in the record that

Pugh discussed the aims of the conspiracy with Cossman before moving the Rovicid out of the Duff

---

[2]On cross-examination, Cossman was asked whether he told Pugh to "hide" the Rovicid, and Cossman said no. However, Cossman's answer does nothing to undermine his testimony that he told Pugh to *get rid of* the Rovicid. It does appear that there was some confusion among the conspirators as to whether the Rovicid should be hidden or destroyed, but that inconsistency is ultimately immaterial. The point is that they agreed to prevent the FDA from sniffing out the mislabeled supplements.

Road warehouse.[3]  Pugh's statement that he would "take care of it" permits the conclusion that he

knowingly agreed to advance the criminal aims of the Berkeley executives.  Thus, a reasonable juror

could fairly conclude that Pugh had the requisite intent to commit conspiracy.

But that is hardly the extent of the evidence against Pugh.  There is also the testimony of

James Seiter, who stated that Pugh told him "the FDA inspectors were coming and to get the

remaining [Rovicid] that hadn't been switched from the old box to the new box out of sight."  Seiter

also testified that he put Rovicid "in [a] rental truck."  Additionally, James Kinmon testified that

Pugh instructed him to drive the rental truck to an off-site parking lot.  A reasonable juror, when

confronted with this testimony, could rationally conclude that Pugh was a knowing participant in the

plot to conceal the Rovicid from the FDA.  Consequently, Pugh's conviction must stand.

B

Pugh's next argument is that the evidence was insufficient because, if anything, it showed

only that he attempted to impede a routine FDA inspection.  The inspection, he argues, does not

qualify as an agency "proceeding" within the meaning of 18 U.S.C. § 1505.  Therefore, according

---

[3]Pugh argues that Cossman's testimony was inconsistent with respect to what exactly was said during the conversation prior to the FDA's arrival.  Pugh contends that, on cross-examination, Cossman indicated that he "could not be certain that Pugh was even told that the FDA was coming." Appellant's Br. at 21.  However, that is an overt misrepresentation of the trial transcript.  In reality, Cossman stated that he could not remember telling *investigators* that he had told Pugh about the FDA inspection.

- 6 -

to Pugh, evidence that he conspired to obstruct the inspection was necessarily insufficient to prove that he conspired to obstruct an agency proceeding.[4]

It is clear, however, that the FDA inspection was an agency proceeding for purposes of the relevant statute.[5]  As we observed in *United States v. Fruchtman*, in the context of § 1505, the term "proceeding" is one "of broad scope, encompassing both the investigative and adjudicative functions of a department or agency."  421 F.2d 1019, 1021 (6th Cir. 1970); *see United States v. Senffner*, 280 F.3d 755, 761 (7th Cir. 2002) (noting that the term "proceeding" is "defined rather broadly"). Indeed, numerous courts of appeals have held that a variety of agency investigative activities constitute "proceedings."  *See, e.g.*, *United States v. Sutton*, 732 F.2d 1483, 1490 (10th Cir. 1984) (holding that failure to comply with a Department of Energy subpoena constituted obstruction of an agency proceeding); *United States v. Browning*, 572 F.2d 720, 723-24 (10th Cir. 1978) (finding that a Bureau of Customs inquiry into the importation practices of the defendants was an agency proceeding); *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976) (finding that the defendant impeded an agency proceeding by submitting false documents in response to an Internal Revenue

---

[4]Pugh also argues that a prejudicial variance occurred because the indictment charged him with conspiracy to obstruct an agency proceeding and the government introduced evidence of a conspiracy to obstruct the FDA inspection.  This argument is simply another manifestation of the contention that the FDA inspection was not an agency proceeding.  As such, it merits no independent discussion.

[5]Pugh contends that this court's reading of the term "proceeding" should be informed by the language of 21 U.S.C. § 331(f), which specifically prohibits refusal to permit an FDA inspection. He is incorrect.  The term "proceeding" appears in 18 U.S.C. § 1505, an entirely different statute. *See United States v. Simpson*, 520 F.3d 531, 537 (6th Cir. 2008) ("Differing statutory contexts justify differing interpretations.").

Service subpoena). Accordingly, because the FDA inspection in this case is largely indistinguishable from other investigative actions found to qualify as proceedings, Pugh's argument fails.

Of course, we acknowledge that, in cases where agency investigations have been deemed to constitute proceedings, "the investigations typically have involved agencies with some adjudicative power, or with the power to enhance their investigations through the issuance of subpoenas or warrants." *United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994). However, that does not alter the conclusion in this case, as the FDA clearly possesses "enhanced" investigative powers. *See* 21 U.S.C. § 374(a) (authorizing the FDA to conduct inspections of "any factory, warehouse, or establishment in which food, drugs, devices, tobacco products, or cosmetics are manufactured, processed, packed, or held, for introduction into interstate commerce or after such introduction"); *United States v. Roux Labs., Inc.*, 456 F. Supp. 973, 975 (M.D. Fla. 1978) (noting that "21 U.S.C. § 374(a), (c), and (d) authorizes FDA agents to conduct reasonable searches and inspections of the premises of businesses and establishments regulated by the act, and to collect samples for testing and examination").

Furthermore, the fact that the FDA inspection was not a "formal administrative action" has no bearing on the conclusion that it was an agency proceeding. *See* Appellant's Br. at 17.[6] As the Eighth Circuit explained in *Rice v. United States*, "it would be absurd to hold that Congress meant to proscribe interference with the administrative process only after [it] had reached a certain formal

---

[6]Pugh makes much of the judicially noticed fact that the FDA "visit[s] some 16,000 facilities a year to monitor the manufacture of products that fall[] under its jurisdiction." However, the sheer numerosity of the inspections has nothing to do with whether they constitute agency proceedings.

stage and let go unpunished individuals who obstruct earlier preliminary proceedings . . . ." 356 F.2d 709, 712 (8th Cir. 1966); *see Browning*, 572 F.2d at 723-24. Indeed, permitting defendants to obstruct routine inspections that lead to more formalized agency actions would frustrate the goal of the statute. The early bird may get the worm, but he should not get impunity from prosecution under § 1505.

## III

Pugh's next argument is that the district court erred in failing to instruct the jury on the definition of the term "proceeding" as it is used in 18 U.S.C. § 1505. "'The standard on appeal for a court's charge to the jury is whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury.'" *United States v. Buckley*, 934 F.2d 84, 87 (6th Cir. 1991) (quoting *United States v. Martin*, 740 F.2d 1352, 1361 (6th Cir. 1984)).

In this case, our review of the jury instructions is brief, for the question of whether an agency action constitutes a "proceeding" is a question for the judge, not the jury. *See Fruchtman*, 421 F.2d at 1021 ("The definition of 'proceeding' as used in the statute was a question of law to be determined by the court rather than the jury."); *United States v. North*, 910 F.2d 843, 894 n.29 ("It is indisputable that the question of whether a proceeding constitutes an inquiry under § 1505 is a matter of law for the court."), *as amended by* 920 F.2d 843 (D.C. Cir. 1990). Consequently, the district court was under no obligation to inform the jury as to the meaning of the term "proceeding," and Pugh's contention fails.

## IV

Pugh also attacks several of the district court's evidentiary rulings. We review such rulings for abuse of discretion. *See McCombs v. Meijer, Inc.*, 395 F.3d 346, 358 (6th Cir. 2005). If an abuse of discretion is found, reversal is warranted only "when 'such abuse of discretion has caused more than harmless error.'" *Ibid.* (quoting *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994)). An evidentiary error is harmless "unless it is more probable than not that the error materially affected the verdict." *United States v. Martin*, 897 F.2d 1368, 1372 (6th Cir. 1990).

A

Pugh's first evidence-related argument is that the district court improperly permitted the government to elicit testimony during redirect examination that was outside the scope of cross-examination. More specifically, Pugh contends that the government should not have been able to ask Cossman about Pugh's statement that he had "hidden" the Rovicid. In evaluating this contention, we are mindful that a "trial judge has broad discretion in determining the scope of redirect examination . . . ." *United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994) (quoting *United States v. Touloumis*, 771 F.2d 235, 241 (7th Cir. 1985)).

Here, the testimony at issue was squarely within the boundaries of the cross-examination. When questioning Cossman, Pugh's attorney asked him about the conversation that had taken place on the eve of the FDA's inspection of the Duff Road warehouse. During that line of questioning, Pugh's attorney asked Cossman whether he told "Steve Pugh to hide product from the FDA[.]" That inquiry plainly "opened the door" to redirect testimony about whether Pugh had squirreled away any Rovicid. *United States v. Brown*, 276 F.3d 211, 218 (6th Cir. 2002). Thus, it cannot be said that the district court abused its discretion in permitting Cossman's testimony on redirect.

B

Pugh's next argument is that the district court erred in admitting certain hearsay statements. At trial, a number of warehouse employees were permitted to testify that they had heard from other employees that the Rovicid was moved to prevent the FDA from discovering it. The district court admitted the testimony over repeated hearsay objections, ruling that the statements were admissible under Federal Rule of Evidence 801(d)(2)(D). In so ruling, the district court stated, "[m]y philosophy is . . . that it is [an] exception to the hearsay rule. They're all employees of the company. They're all admissions against interest here."

Assuming, *arguendo*, that the district court's ruling was improper, there is still no cause for reversal. The record contains unequivocal—and plainly admissible—testimony from several individuals who stated that Pugh knew the FDA was coming. Thus, the hearsay statements at issue were cumulative, rendering any mistake on the part of the district court harmless. *See Hamblin v. Mitchell*, 354 F.3d 482, 496 (6th Cir. 2003) (holding that an evidentiary error was harmless where "[m]uch of the [improperly admitted] information . . . was cumulative of information that was properly admitted, and the [other] evidence pointing to defendant's guilt was very strong").

C

Pugh's final evidentiary argument is that the district court improperly permitted the government to elicit testimony through leading questions. Under Federal Rule of Evidence 611(c), "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." Given the language of Rule 611(c), "[i]t is well

recognized that the use of leading questions during the direct examination of a witness falls within the sound discretion of the trial court." *United States v. Shoupe*, 548 F.2d 636, 641 (6th Cir. 1977).

Here, Pugh objects to a number of instances in which the government's attorney was simply attempting to focus the witness or to otherwise clarify testimony.[7] In the words of the district court, all the government's attorney did was "focus[] on a particular area of inquiry on cross-examination, so we [did not] have to go around the mulberry bush." Leading is permissible under those circumstances. *See United States v. Kuehne*, 547 F.3d 667, 692 (6th Cir. 2008) (holding that "leading questions [may be] utilized to direct a witness' attention to a particular individual or date, or to clarify testimony"). Thus, the district court did not abuse its discretion.

V

Pugh's final argument is that a new trial is needed because the prosecutor's rebuttal argument was laced with improper remarks. To decide whether a prosecutor's remarks and conduct merit a new trial,[8] we employ a two-part test. *Cristini v. McKee*, 526 F.3d 888, 899 (6th Cir. 2008) (citing *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007)). First, we must examine "whether the prosecutor's conduct and remarks were improper." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001) (citing *United States v. Carroll*, 26 F.3d 1380, 1387 (6th Cir. 1994)). Second, if the

---

[7]One of the objections to which Pugh refers did not even deal with leading questions. Rather, Pugh's attorney objected on the grounds that the witness's answer was non-responsive.

[8]"Whether statements made by a prosecutor amount to misconduct and whether such statements render a trial fundamentally unfair are mixed questions of law and fact, which we review *de novo*." *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009) (citing *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999)).

conduct and remarks were improper, "the court must . . . consider and weigh four factors in determining whether the impropriety was flagrant and thus warrants reversal." *Ibid.* The four factors are: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Ibid.* Additionally, "[w]hen considering challenges to a prosecutor's statements at trial, we examine those statements within the context of the [entire] trial to determine whether they were prejudicial error." *Cristini*, 526 F.3d at 899 (citing *Girts*, 501 F.3d at 759).

We hold that the prosecutor's conduct in this case does not merit reversal. At bottom, the remarks at issue were not sufficiently prejudicial in light of the fact that the district court issued a forceful curative instruction. *See United States v. Carson*, 560 F.3d 566, 576 (6th Cir. 2009) (holding that prejudice caused by a prosecutor's improper remarks may be cured or minimized through curative instructions). A more complete explanation of our holding is set forth in *United States v. Warshak*, No. 08-3997, at *44-55 (6th Cir. 2010), which addresses the same prosecutorial misconduct claims–arising out of the same trial–that Pugh separately raises here.

VI

For the foregoing reasons, Pugh's conviction is **AFFIRMED**.