941 F.2d 181
 37 Cont.Cas.Fed. (CCH) P 76,177, 34 Fed. R.
Evid. Serv. 715
UNITED STATES of America, Appellee,
v.
Gerald A. LEO, a/k/a "Bud," Appellant.
UNITED STATES of America, Appellee,
v.
James BADOLATO, Appellant.
 Nos. 90-1582, 90-1583.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 23, 1991.
Decided July 25, 1991.
 
 Seymour I. Toll (argued), Michele Langer, Teresa A. Wallace, Doron A. Henkin, Toll, Ebby & Langer, Philadelphia, Pa., for appellant Gerald A. Leo.
 Gregory P. Miller (argued), Marc S. Raspanti, Adam Scaramella, Miller, Alfano & Raspanti, P.C., Philadelphia, Pa., for appellant James Badolato.
 Michael J. Rotko, Acting U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Nicholas C. Harbist (argued), David M. Howard (argued), Asst. U.S. Attys., Philadelphia, Pa., for appellee.
 Before BECKER and HUTCHINSON, Circuit Judges, and SMITH, District Judge.*
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 
 1
 Co-defendants Gerald A. Leo (Leo) and James Badolato (Badolato) appeal from judgments of conviction and sentence entered against them following a jury trial in the United States District Court for the Eastern District of Pennsylvania. For the reasons set forth below, we will affirm the judgments.
 
 I.
 
 2
 On November 29, 1988, a grand jury sitting in the United States District Court for the Eastern District of Pennsylvania handed up a 321-count indictment against Leo, Badolato and General Electric Corporation (General Electric), doing business as Management and Technical Services Company (MATSCO), on various charges related to alleged defense contract fraud and an alleged cover-up that followed. MATSCO was charged with five counts of mail fraud, see 18 U.S.C.A. § 1341 (West Supp.1991), and 312 counts of violating the criminal False Claims Act, see 18 U.S.C.A. § 287 (West Supp.1991). Leo was charged with five counts of mail fraud, one count of racketeering, see 18 U.S.C.A. § 1962 (West 1984 & Supp.1991), and two counts of making false statements to government agencies, see 18 U.S.C.A. § 1001 (West 1976). Badolato was charged with five counts of mail fraud, one count of racketeering, one count of making a false statement to a government agency and one count of endeavoring to obstruct Defense Department proceedings, see 18 U.S.C.A. § 1505 (West 1984).[1]
 
 
 3
 Jury selection began on October 30, 1989, and the trial commenced on November 14, 1989. Testimony at trial did not conclude until January 22, 1990. On February 2, 1990, the jury returned its verdict. It convicted MATSCO on four counts of mail fraud and 282 counts of violating the False Claims Act. It convicted Leo on four counts of mail fraud and one count of making a false statement; at the close of its case, the government had dismissed the other false statement charge against Leo. The jury also convicted Badolato on one false statement count and on the count that charged him with endeavoring to obstruct agency proceedings.
 
 
 4
 On July 26, 1990, the district court sentenced the three defendants. It accepted a joint recommendation from the government and MATSCO that MATSCO be sentenced to pay a $10,000,000.00 criminal fine. As part of the agreement, the government says that General Electric paid an additional $8,300,000.00 in civil damages and $11,700,000.00 to resolve other civil matters. General Electric also agreed not to appeal the district court's judgment of conviction and sentence. The district court sentenced Leo to ten months imprisonment on the mail fraud charges and ordered him to pay a $15,000.00 fine on the false statement conviction. The district court sentenced Badolato to five months imprisonment on the charge of endeavoring to obstruct agency proceedings and ordered him to pay a $10,000.00 fine on his false statement conviction.
 
 
 5
 As required when reviewing convictions, we recite the relevant facts in the light most favorable to the government. Cf. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The testimony at trial focused on a contract between the United States Army and MATSCO for the production of mobile battlefield computer systems housed in trailer-like vans. The system was called the Decentralized Automated Service Support System, more commonly known as DAS-3B. The indictment charged that Leo, a long-time General Electric employee who was responsible for the management of the materials and purchasing department for MATSCO, and Badolato, who was MATSCO's subcontracts manager, executed a scheme to defraud the Army out of millions of dollars on the contract in order to advance their standing within the company. Further, the indictment alleged that, after the contract between the Army and MATSCO was signed in June of 1983, Leo and Badolato committed various acts to hide the fraud from the Defense Department.
 
 
 6
 In 1979, the Army awarded MATSCO a competitive contract to build mobile computer systems that could be housed in trailer-like vans and used for logistical support for Army units around the world. The Army sent a team of specialists to the MATSCO plant in 1982 to assist in the development of an updated version of the van.
 
 
 7
 The contract called on MATSCO to produce 233 of the DAS-3B vans over five years. The contract also gave the government the option to purchase twenty-five more in the sixth year. It was known as a "firm fixed price contract." As we will now explain, the "firm fixed price" is initially not so firm and fixed. The 1962 amendments to the Armed Services Procurement Act of 1947 (Act), Pub.L. No. 87-653, 76 Stat. 528 (1962) (codified in scattered sections of 10 U.S.C.A.),[2] and regulations promulgated under the Act applied to MATSCO's contract with the Army. Under the Act, a contractor must furnish the procuring agency a proposal that includes the contractor's best estimate of the costs the contractor expects to incur in making the product. See 10 U.S.C.A. § 2306(f)(1) (West 1983). Thus, the contractor must give its best estimate of anticipated material costs, labor, overhead, general and administrative expenses and then show its anticipated profit. The government and the contractor then negotiate over the amount of these projections as well as the appropriate percentage of total cost that should be added for profit in arriving at the final price. If the contractor's costs change before a final agreement is reached, the contractor must inform the Army. Once a final agreement is reached, the contractor must provide the Army with a Certificate of Current Cost, which certifies that all of the cost information provided to the Army as of the date of the final agreement is accurate, current and complete.
 
 
 8
 MATSCO's proposal on the DAS-3B contract was first submitted to the Army on January of 1983. MATSCO submitted a revised proposal in March of 1983. In accord with the instructions for the proposal, MATSCO promised the Army that it would update the prices upon which the proposal was based as negotiations with subcontractors continued.
 
 
 9
 The subcontract component of the proposal amounted to $156,715,300.00, based upon quotations received from subcontractors. The largest subcontract covered the Honeywell Information Systems computers to be placed into the vans. Aside from the computers, the March, 1983 proposal contained about $67,000,000.00 in estimated subcontract costs for thirty other subcontractors.
 
 
 10
 Leo's job at General Electric was purchasing for government contracts. He testified at trial that one of his strong points that helped him in that job was his vast knowledge of procurement and subcontract procedures and regulations, both government and commercial. See Joint Appendix (Jt. App.) at 837f. Among Leo's responsibilities was the preparation of updates on the proposal's cost estimates throughout the negotiation process. Leo testified that if the General Electric personnel principally responsible for negotiations with the Army over costs and prices needed any information about a subcontract's status, they would have to come to him.
 
 
 11
 Occasionally during the negotiations, Army negotiators asked General Electric negotiators whether there were any expected reductions in the subcontractor costs. The General Electric negotiators answered that with the exception of the Honeywell subcontract, there were no major reductions in subcontractor costs expected. This answer was based upon the information Leo relayed to General Electric negotiators.
 
 
 12
 On April 13, 1983, Leo himself briefed the Army negotiators. He told them that since the March, 1983 proposal certain subcontractor costs had gone up while others had gone down. On May 3 and 4, 1983, the Army and General Electric negotiated over the final estimate of subcontractor costs. During these final negotiations, Leo again represented that subcontractor costs apart from the Honeywell subcontract were basically unchanged from the March, 1983 estimate. Leo also proposed an additional $4,200,000.00 in subcontract costs he said were needed to cover what he called a "scope increase," which represented additional requirements not included in the March 1983 cost proposal.
 
 
 13
 Based on Leo's representation that subcontractor costs other than Honeywell's would remain about the same, the Army and General Electric agreed to a proposal under which MATSCO would reduce the $67,000,000.00 in proposed subcontract costs, which did not include Honeywell's cost, by six percent and would reduce the $4,200,000.00 scope increase by eight percent. Thus, the Army agreed to pay nearly $67,000,000.00 for the thirty subcontractors other than Honeywell. At the close of negotiations, Leo told the Army negotiators that the proposed reduction of expenses would be difficult to meet. On June 6, 1983, the date of the final price agreement, General Electric certified to the Army that as of June 2, 1983 all cost data were accurate, current and complete.
 
 
 14
 In fact, that was not the case. The government presented evidence at trial that Leo and Badolato had actually negotiated millions of dollars in subcontract savings between February of 1983 and June 2, 1983 without the Army's knowledge. As of April 13, when Leo met with the Army negotiators, MATSCO had reduced its subcontract costs by $6,610,967.00. Thus, the government contended at trial that the information Leo provided to the Army negotiators that day was false and fraudulent. By May 4, 1983, when the final subcontract negotiations were taking place between General Electric and the Army, MATSCO had achieved savings of $10,650,797.00 on the proposed subcontract costs. The cost reduction proposal that Leo said on May 4, 1983 would be so difficult to meet had already been exceeded by more than $6,000,000.00. On June 2, 1983, just before the contract was finalized, MATSCO had pretty well assured itself of over $12,800,000.00 in subcontract savings that had not been disclosed to the Army.
 
 
 15
 The government also introduced evidence that Leo and Badolato were responsible for inflating the March, 1983 revised proposal. Leo's superiors instructed him to bid only on the known requirements, yet Leo, on two occasions, and Badolato, on one occasion, told subcontractors to pad their quotes in anticipation of unknown contingencies. Leo and Badolato never disclosed the padding to the Army. Nor was the Army informed later when these subcontractors removed the contingency padding from their prices. The government also introduced evidence to show that it was Leo who ran up the March, 1983 proposal by including $696,000.00 in premium costs for expedited delivery, even though the Army negotiators thought that it was the subcontractors themselves that had insisted on this cost item. At trial, the two subcontractors that testified denied requiring the premium.
 
 
 16
 In late October of 1983, the Defense Contract Audit Agency began a standard post-award audit of the DAS-3B contract to see whether the cost and price data submitted to the Army had been accurate, complete and current as of June 2, 1983. Supervisory auditor Carl Stern (Stern) headed the audit.
 
 
 17
 Stern began to audit subcontractor costs in the summer of 1984. Working out of the MATSCO department that contained Leo and Badolato's offices, Stern began to review the purchasing files that Badolato had given him. In October of 1984, Stern noticed that many subcontracts had been placed before June 2, 1983 at prices less than those disclosed to the Army.
 
 
 18
 In November of 1984, Stern prepared a list of thirty subcontractors in which he included his conclusions about when particular purchase order prices had been firmly established. Stern gave the list to Leo and asked Leo to comment on the dates Stern had included. Before receiving Leo's comments on the list, Stern noticed that the purchasing files were in Leo's office. On December 14, 1984, a General Electric finance manager returned Leo's version of the subcontract dates on a copy of Stern's list to Stern. Leo had filled in all but a few of the dates. Leo's dates indicated that subcontract prices for a number of subcontractors were not established until after May 4, 1983. Leo had earlier told other General Electric employees that these very same subcontractors had their prices established before May 4.
 
 
 19
 After learning of Stern's initial findings on the timing of firm costs for subcontracts, General Electric finance executive Michael Kennedy (Kennedy) began a separate review of the purchasing files. While seeking information regarding the future year prices for a particular vendor, Kennedy checked the finance department's copy of a purchase order. He compared the purchase department's files with copies of the same information in the finance department's files. He found the purchasing department's order dates differed from the finance department's copy. This aroused his suspicion. Twice he asked Leo and Badolato about the discrepancies. Both times each expressed surprise.
 
 
 20
 On January 15, 1985, Badolato changed his story. He told Kennedy that in January of 1984 he altered eight purchase orders placed before June 2, 1983, to reflect dates after June 2, 1983. Badolato told Kennedy that Leo had no knowledge of this and that Stern's audit had nothing to do with the changes. Instead, Badolato claimed he altered the dates because of a late 1983 unrelated review of MATSCO's purchasing system by another Defense Department division. As it turned out, Badolato had altered about fourteen documents in January of 1984. These alterations caused other purchasing personnel to place incorrect dates on amendments made to those fourteen orders. All told, this resulted in about forty documents bearing false purchase dates.
 
 
 21
 Badolato's reason for altering the dates was disputed. Defense Department analysts who conducted the purchasing system review in 1983 testified that eight of the purchase orders Badolato altered in January 1984 were reviewed in the summer of 1983, at which time the Defense Department analysts told Badolato that they did not intend to look at these purchase orders again.
 
 
 22
 After Badolato had made his initial acknowledgement to Kennedy, it was discovered that Badolato had also altered two copies of purchase orders bearing the signature of subcontractor representatives. Badolato had also asked three vendors to provide MATSCO with false certificates of current costs. Leo joined Badolato in one of these requests.
 
 II.
 
 23
 The district court exercised jurisdiction over the charges against Leo and Badolato pursuant to 18 U.S.C.A. § 3231 (West 1985). We have jurisdiction over these appeals pursuant to 28 U.S.C.A. § 1291 (West Supp.1991).
 
 
 24
 Leo raises five issues on appeal. First, he contends that the government failed to produce sufficient evidence to support his conviction for having made a false statement. Second, he argues that the district court abused its discretion and erred as a matter of law in permitting General Electric finance executive Kennedy to testify about his audit of the DAS-3B contract. Third, he asserts that the district court violated his constitutional right to mount a complete defense when it limited his ability to deny the motive for wrongdoing that the government alleged. Fourth, Leo contends that the district court abused its discretion in excluding testimony from another General Electric auditor that he believed Leo over another witness. Leo's final argument is that the district court abused its discretion in allowing expert testimony concerning industry customs and practices in the field of defense contracting. If we rule in favor of Leo on any of his evidentiary arguments, he asks that we grant him a new trial.
 
 
 25
 Badolato raises two arguments in his appeal. First, he contends that the count charging him with obstructing proceedings before the Defense Department failed to charge a criminal offense. In his other argument, Badolato claims that the district court erred in refusing to give the jury his proposed instruction to consider his later correction of his false statements in deciding whether he made the false statements intentionally. This correction occurred, Badolato argues, when he admitted having made purchase order alterations to Kennedy. MATSCO officials then informed the Army of the alterations.
 
 
 26
 On Leo's sufficiency issue, we view the evidence in the light most favorable to the government as the winner of the jury verdict. So considering the record, we then determine whether there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Leo was guilty of having made a false statement. See United States v. Gonzalez, 918 F.2d 1129, 1132 (3d Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1015, 112 L.Ed.2d 1097 (1991).
 
 
 27
 Leo's remaining four issues all relate to rulings on the admission of evidence. We review them for abuse of discretion, rejecting Leo's argument that we should exercise plenary review over the district court's relevancy rulings in accord with a statement in In re Japanese Elec. Prods. Antitrust Litig., 723 F.2d 238, 269 (3d Cir.1983), rev'd on other grounds sub nom. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In Pfeiffer v. Marion Center Area School Dist., 917 F.2d 779, 781 (3d Cir.1990), we determined that the statement in Japanese Elec. Prods. that relevancy rulings would receive plenary review conflicted with an earlier holding of our Court and thus would be deemed to be without effect. See also United States v. Eufrasio, 935 F.2d 553, 571 (3d Cir.1991). Therefore, we will use the abuse of discretion standard in our review of all of the evidentiary rulings at issue here.
 
 
 28
 We exercise plenary review over whether the count of the indictment that charged Badolato with obstructing Defense Department proceedings charged an offense under the law. See United States v. Markus, 721 F.2d 442, 443 (3d Cir.1983). Finally, with regard to the district court's decision to refuse Badolato's proposed instruction about his correction of earlier untruths, we review the decision under an abuse of discretion standard. In the course of making that determination, we will look to see whether the proffered instruction was legally correct, whether it was not substantially covered by other instructions and whether its omission prejudiced him. See United States v. Smith, 789 F.2d 196, 204 (3d Cir.), cert. denied, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986).
 
 III.
 A.
 
 29
 Leo first argues that the evidence, even when taken in the light most favorable to the government, does not meet the substantial evidence test necessary to uphold the jury's determination that he was guilty of the charge that he made a false statement in a false writing or that he concealed material facts by trick, scheme or device, in violation of 18 U.S.C.A. § 1001 (West 1976). Section 1001 provides:
 
 
 30
 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 
 
 31
 Id.
 
 
 32
 The false statement count of the indictment for which Leo was convicted charged that he:
 
 
 33
 submitted a schedule to the Army contracting officer and the [Defense Contract Audit Agency] which represented the specific dates of the contract negotiation with subcontractors when in truth and fact ... Leo ... well knew that: (1) altered and falsified documents were submitted to the [Audit Agency] auditors to conceal the true negotiation dates; and (2) "Contingencies" were routinely used to inflate cost and pricing data in the contract pricing proposals of subcontracts under audit.
 
 
 34
 Jt.App. at 57.
 
 
 35
 The government presented the following evidence at trial: supervisory auditor Stern testified that he gave Leo a list of subcontractor bid dates in November of 1984 and asked Leo to comment on the accuracy of these dates.[3] Stern received Leo's response on December 14, 1984, three days after Stern presented his informal findings at a meeting of MATSCO representatives, which included Badolato.
 
 
 36
 The government also argues that the format of Stern's list made it clear to Leo that Stern wanted Leo to confirm or deny the accuracy of Stern's conclusions about the dates the thirty listed subcontracts became firm as to price. The column to which Leo was to respond was marked "Date P.O. [purchase order] price established." Jt.App. at 330. That is the very column to which Leo did in fact respond. Further, Leo admitted in a handwritten memo from late 1985, which conflicted with the testimony he gave at trial, that he understood that he was given the list to advise Stern if Stern's numbers and dates were correct. Thus, the government argues that there was substantial evidence that Leo knew that Stern expected to receive from Leo the correct dates on which purchase order prices were established.
 
 
 37
 While Leo claims there was no evidence to show that he knew Badolato had altered the date of one particular subcontract with Avanti, the government introduced evidence that Leo knew that five other subcontractors had firm subcontract prices before May 4, 1983, the date of final negotiations over subcontractor costs. Nevertheless, in his response to Stern's list Leo stated that the dates of three of these five other subcontracts did not become firm until late May of 1983. If, as we must assume, the jury believed the government's evidence that Leo knew all five of these other subcontracts were firm before May 4, Leo's defense that he did not know there were savings achieved between May 4 and June 2, 1983[4] that were undisclosed to the Army collapses since the jury could infer Leo knowingly failed to disclose significant savings that had been achieved before May 4. This explains why Leo tried to push until after May 4 as many dates as possible on the list Stern provided.
 
 
 38
 With respect to the Avanti contract, the government sought to convince the jury that Leo had willfully turned a blind eye to whether the purchase order date he reported on Stern's list was the actual date the purchase order was established. The government produced evidence at trial that Stern, when reviewing the MATSCO purchasing files, noticed that the initial Avanti purchase order bore the date June 8 but that a spare parts contract for the very same product bore the date May 13. General Electric finance executive Michael Kennedy testified that when he reviewed the same files as Leo and saw this inconsistent information, he checked the finance department's copies of the files and found eight altered purchase orders, including the Avanti contract. The government thus argued at trial that Leo's testimony, that he did not notice the discrepancy, should not be believed given his extensive, twenty-year background in purchasing for government contracts.
 
 
 39
 Next, the government notes that by Leo's own admission Stern asked him to certify whether the subcontractor costs on the list were correct. In response, Leo failed to state that the costs on the list included padding for contingencies, an expense that Leo never reported to the Army. Thus, the government contends that sufficient evidence exists to prove Leo's concealment of material facts. Leo argues that he had no affirmative duty to disclose the inclusion of contingencies. However, the contract itself clearly requires General Electric, and therefore its agents, to provide current, accurate and complete cost information.
 
 
 40
 Finally, Leo argues that he did not know that the list would be returned to the Defense Department. However, in United States v. Yermian, 468 U.S. 63, 73, 104 S.Ct. 2936, 2941, 82 L.Ed.2d 53 (1984), the Supreme Court held that a defendant's actual knowledge that his false statement would be transmitted to a government agency is not an essential element of a false statement offense under 18 U.S.C.A. § 1001, the statute at issue here. Leo's argument that he lacked knowledge his statement would be returned to the Defense Department is not a ground for acquittal unless Yermian is distinguishable.
 
 
 41
 Leo claims that while Yermian did hold that actual knowledge was not required by § 1001, the Court did not foreclose the necessity of proving a lesser mental requirement of reasonable belief or at least foreseeability. Leo is correct. However, in the wake of Yermian, four of our sister courts of appeals have held that § 1001's requirement of federal involvement is merely jurisdictional and that "no mental state is required with respect to federal involvement in order to establish a violation of § 1001." United States v. Bakhtiari, 913 F.2d 1053, 1060 (2d Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991); see United States v. Gibson, 881 F.2d 318, 323 (6th Cir.1989); United States v. Suggs, 755 F.2d 1538, 1542 (11th Cir.1985); United States v. Green, 745 F.2d 1205, 1209 (9th Cir.1984), cert. denied, 474 U.S. 925, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985).
 
 
 42
 We agree with those courts and hold that the plain language of § 1001 and the thrust of the majority opinion in Yermian demonstrate, as the court wrote in Bakhtiari, "that no culpability standard is applicable with regard to the jurisdictional element of the statute." 913 F.2d at 1061 (emphasis in original). For this reason, we hold that Leo's alleged lack of knowledge of federal jurisdiction does not provide grounds for setting aside the jury's verdict on the false statement count.
 
 
 43
 After the jury returned a general verdict finding Leo guilty on the false statement count, the district court asked the jury to determine the theory under which it had unanimously found Leo guilty. The jury answered the district court's special interrogatory by stating that it had found both that Leo had made a false writing and that he had concealed material facts by scheme, trick and device. The government correctly notes that even if one theory is deficient, we must uphold the jury's verdict so long as the other theory is adequately supported in the record. See United States v. Ryan, 828 F.2d 1010, 1019-20 (3d Cir.1987).
 
 
 44
 Viewing all of this evidence in the light most favorable to the government and having considered all the contentions of the parties with respect to the evidence described above, we hold that the evidence is sufficient to sustain Leo's conviction on the charges that he had made a false writing and that he had concealed material facts by scheme, trick and device. While Leo, who testified in his own defense at trial, denied the crucial facts that the government put before the jury, the jury's verdict shows that it believed the government's version, not Leo's. We must affirm Leo's conviction on count nine "if a rational trier of fact could have found [him] guilty beyond a reasonable doubt and the convictions are supported by substantial evidence." Gonzalez, 918 F.2d at 1132. For us to sustain the verdict against Leo, the evidence against him "does not need to be inconsistent with every conclusion save that of guilt." Government of Virgin Islands v. Williams, 739 F.2d 936, 940 (3d Cir.1984) (quoting United States v. Allard, 240 F.2d 840, 841 (3d Cir.1957)). The government adduced ample evidence for a rational jury to find Leo's guilty beyond a reasonable doubt under count nine of the indictment; therefore, we reject Leo's argument that the evidence was insufficient to support his conviction for having violated 18 U.S.C.A. § 1001.
 
 B.
 
 45
 Having examined Leo's sufficiency argument, we pass to consideration of his evidentiary contentions and comment first on the issues he raises concerning the testimony of General Electric finance executive Kennedy.
 
 
 46
 Leo first argues that the district court abused its discretion in allowing Kennedy to testify about his audit of the DAS-3B contract. He also objects to several exhibits that the district court admitted into evidence during the government's examination of Kennedy. The government responds by arguing that Kennedy's testimony was admissible either as expert or lay opinion and defends the admission of the challenged exhibits.
 
 
 47
 In December of 1984, Kennedy began his audit of the DAS-3B contract, which soon became a regular part of his business activity. At that time, Kennedy had been a manager in finance for General Electric for over thirty years. Between 1981 and 1985, Kennedy managed General Electric's Tactical Data Systems, which included MATSCO. While managing Tactical Data Systems, Kennedy performed financial analysis and forecasting, created and monitored budgets and plans and tracked costs and profits. Once MATSCO accepted the Army's proposal to cut subcontractor costs, Tactical Data Systems attempted to keep track of the effort to meet this proposal.
 
 
 48
 In the audit he performed, Kennedy and two subordinates reviewed all material in the purchasing department's files for the thirty MATSCO subcontractors. In his preliminary review, Kennedy noticed that many purchase order prices had been established before June 2, 1983, the key date on the certificate of current costs that MATSCO provided to the Army. Kennedy also met with Leo and received written comments from Leo. Leo agreed with most of Kennedy's conclusions as to when subcontract purchase prices had been established.
 
 
 49
 Kennedy's review continued through most of 1985. Kennedy testified at trial that his goal in the audit was to discover the truth. See Supplemental Appendix (Supp.App.) at 823. Based on Kennedy's audit, General Electric decided to refund $3,690,500.00 to the United States.1.
 
 
 50
 In its brief on appeal, the government first contends that Kennedy's testimony was admissible as expert testimony. See Brief of Appellee at 27. It is well established that a district court has broad discretion over whether to recognize a witness as an expert. See Salem v. United States Lines, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); United States v. Vastola, 899 F.2d 211, 234 (3d Cir.1990) (quoting Salem), vacated on other grounds, --- U.S. ----, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990).
 
 
 51
 Here, the district court did not rule that Kennedy was qualified to give expert testimony. Instead, the district court held that Kennedy could testify to certain opinions he formed pursuant to Federal Rule of Evidence 701, which governs opinions offered by lay witnesses.
 
 
 52
 The reason the district court did not pass upon Kennedy's qualification as an expert is that the government repeatedly contended before the district court that Kennedy would not be testifying as an expert. See Jt.App. at 515 ("This is not in the nature of expert testimony."); Jt.App. at 605 ("If it is opinion testimony, ... we cited two cases, your Honor, in which it was permitted for a non-expert to offer opinion based upon his review of business records.").
 
 
 53
 In Vastola we held that the government did not have to utter any formal incantation to request that its witness be admitted as an expert. Instead, we held that so long as the defendant is on notice that the witness would testify as an expert, the defendant cannot later be heard to argue that the government failed formally to ask that its witness's opinions be admitted as those of an expert. Vastola, 899 F.2d at 234.
 
 
 54
 The government's argument that we should now qualify Kennedy as an expert turns Vastola upside down. Instead of placing Leo on notice that Kennedy would be testifying as an expert, the government expressly informed Leo and the district court that Kennedy would not testify as an expert. At most, the government only once, in passing, referred to Kennedy as an expert in General Electric's corporate structure on the alleged acts of wrongdoing because General Electric relied upon Kennedy's audit in determining how much money to refund to the government as a result of the inflated cost of the DAS-3B program. See Jt.App. at 515.
 
 
 55
 As we recognized in Vastola, whether to certify a witness as an expert is a fact-intensive question that we review under the abuse of discretion standard. Vastola, 899 F.2d at 234. Usual trial practice requires the proponent of expert testimony to show the witness's qualifications. The party opposing the expert witness is then given a chance to attack the witness's qualifications as an expert and cross-examine him about them. The district judge may also question the witness before certifying him as an expert.
 
 
 56
 Here, the government never sought at trial to have Kennedy qualified as an expert witness. We agree with the Tenth Circuit that a party cannot seek to have a witness certified as an expert on appeal when the party did not seek to have the witness qualified as an expert before the district court. See United States v. Hoffner, 777 F.2d 1423, 1425 n. 1 (10th Cir.1985).
 
 2.
 
 57
 The government, however, advances an alternate basis for admitting Kennedy's testimony. It contends that his testimony was proper under Federal Rule of Evidence 701. Rule 701, entitled "Opinion Testimony by Lay Witnesses," provides:
 
 
 58
 If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.
 
 
 59
 Fed.R.Evid. 701. This rationale was advanced at trial, and the district court held that the opinions Kennedy gave during his testimony were admissible as lay opinion. We review the district court's ruling that Kennedy's opinions were admissible under Rule 701 for abuse of discretion. See Eisenberg v. Gagnon, 766 F.2d 770, 780 (3d Cir.), cert. denied, 474 U.S. 946, 106 S.Ct. 346, 88 L.Ed.2d 290 (1985).[5]
 
 
 60
 Kennedy testified about the conclusions he formed while investigating General Electric's purchasing department files. For example, after summarizing the documents, he explained how certain purchase order dates had been changed. His opinion testimony accordingly satisfied Rule 701(a)'s requirement that lay opinion testimony be "rationally based on the perception of the witness." Fed.R.Evid. 701(a). Our Court has specifically held that lay opinion testimony can be based upon a witness's review of business records. See Teen-Ed, Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 403-04 (3d Cir.1980); see also In re Merritt Logan, Inc., 901 F.2d 349, 359-60 (3d Cir.1990); Eisenberg, 766 F.2d at 781.
 
 
 61
 Rule 701(b) requires lay opinion testimony to be "helpful." Kennedy's testimony was helpful in allowing the jury to synthesize and understand the many documents contained in the thirty subcontract files that he had examined. The district court did not abuse its discretion in deciding that Kennedy's lay opinion testimony would be helpful to the jury in determining a fact in issue. This satisfies Rule 701's second prong.
 
 
 62
 In Teen-Ed we stated that the "modern trend favors the admission of opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." Teen-Ed, 620 F.2d at 403. Here, the district court gave Leo wide latitude to cross-examine Kennedy. Leo's attacks on Kennedy's prior auditing experience and the manner in which he conducted this specific audit go to the weight, not the admissibility, of Kennedy's testimony. The district court did not abuse its discretion in admitting Kennedy's testimony as lay opinion.
 
 3.
 
 63
 Leo also claims the district court erred with respect to four exhibits that the government introduced through Kennedy. The first is a chart containing Kennedy's findings that Kennedy's boss, Robert Morris, used to brief high ranking General Electric officials. The second and third are summaries containing conclusions from an audit that Kennedy himself prepared. The final document is a memo from General Electric counsel Gordon Clarke to Kennedy stating that "one cannot proffer a number which is outdated and 10% too high, and then 'negotiate' out the 10% and call it a good faith negotiation." See Jt.App. at 325.
 
 
 64
 Leo failed to make proper timely objections to any of these exhibits. He did not specifically object to the first three exhibits as hearsay. He did not object to the Clarke letter until well after the district court had admitted it into evidence. Leo's first objection to the Clarke letter came when Kennedy began to read from it to the jury. The district court overruled Leo's objection, perhaps because it had already accepted the letter into evidence against Leo. In a frank admission, Leo notes in his brief that most of the evidence relating to Kennedy's audit was also before the jury through numerous other direct witnesses. See Brief for Leo at 35.
 
 
 65
 Because Leo did not advance timely objections at trial to any of these four exhibits, our review of the district court's admission of these exhibits is limited to plain error. See Fed.R.Evid. 103(d) (where party fails to make timely objection to evidentiary ruling, review of ruling is for plain error). Plain errors are those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings." United States v. Santos, 932 F.2d 244, 250 (3d Cir. 1991) (quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). They are errors that "undermine the fundamental fairness of the trial...." United States v. Young, 470 U.S. 1, 16, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). The Supreme Court has cautioned that the doctrine is to be used "sparingly," United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982), and only where the error was sure to have had an "unfair prejudicial impact on the jury's deliberations," Young, 470 U.S. at 16 n. 14, 105 S.Ct. at 1047 n. 14.
 
 
 66
 We believe that Leo's admission in his brief that most of the information contained in the four Kennedy exhibits was already before the jury dooms his argument under the plain error standard. Where the same evidence comes before the jury properly and improperly, the improper admission of cumulative evidence is not plain error.
 
 
 67
 Even if Leo's attorney had advanced timely objections to these four exhibits, we do not believe that Leo would be entitled to a new trial. A portion of the chart Robert Morris used to brief high ranking General Electric officials was not admitted against Leo at trial; instead, the district court specifically cautioned the jury that it was to consider that part of the briefing chart as evidence solely against General Electric. The rest of the chart contained economic data that Kennedy uncovered in his audit and was thus admissible as a business record. See Fed.R.Evid. 803(6). The two summaries that Kennedy prepared during his audit were not inadmissible hearsay because they also fell within the exception for business records. See id. We reject Leo's contention that these summaries contained opinions on the ultimate issue of Leo's mental state and were thus inadmissible under Federal Rule of Evidence 704. Finally, we agree with Leo that the Clarke letter did contain hearsay and thus should not have been admitted had Leo advanced a timely objection. Had Leo advanced a timely objection, however, we would hold that admission of the Clarke letter constituted harmless error. See Fed.R.Crim.P. 52(a).
 
 
 68
 Under Rule 52(a), error is harmless if "it is 'highly probable' that the ... error[ ] did not contribute to [the] jury's judgment of conviction." See United States v. Stevens, 935 F.2d 1380, 1407 (3d Cir.1991) (quoting Government of Virgin Islands v. Toto, 529 F.2d 278, 284 (3d Cir.1976)). Most of the Clarke letter contained merely a summary of what was already properly before the jury. The district court's admission of those parts of the letter thus was harmless error. We also believe that admission of Clarke's comment in the letter about lack of good faith negotiation, while posing a closer question, was also harmless error. For these reasons, even if Leo had advanced timely objections to admission of these four exhibits, he would not be entitled to a new trial.
 
 C.
 
 69
 We next consider Leo's argument that the district court restricted his testimony in his own defense. While on the stand, Leo sought to undermine the government's proffered motive for his criminal actions. It will be recalled that the government alleged that Leo failed to report substantial contract savings to the Army in order to inflate General Electric's profit on the project. Thus, the government charged, Leo committed his crimes to curry favor with his bosses.
 
 
 70
 To dispute the government's alleged motive, Leo wanted to testify about some events that occurred at MATSCO in 1985 concerning Badolato. In early 1985, it should be remembered, Leo's superiors discovered that Badolato had altered purchase orders. In April, 1985, they told Leo to fire Badolato, but Leo refused. Leo wanted to testify about this to show that he was willing to stand up to demands he thought were wrong in contradiction of the government's charge that he engaged in criminal conduct to look good in the eyes of his bosses. Leo also wanted to introduce passages from his diary written in April of 1985 that explained why he would not fire Badolato to expand on his trial testimony showing him as a person of moral fortitude. Instead of firing Badolato, Leo told his bosses that even though Badolato had altered purchase orders Badolato was a loyal employee who should not be fired for one mistake.
 
 
 71
 Among the charges in the indictment was one that charged Leo with involvement in a conspiracy that lasted through June of 1985. Nevertheless, the district court ruled that Leo's testimony on this issue had no relevancy, since the fraud that Leo was alleged to have participated in directly took place before June 4, 1983, while Badolato's firing did not become an issue until April 2, 1985. Leo contends that the district court's ruling infringed upon his constitutional right to present a complete defense. See Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (recognizing that the "Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense' ") (quoting California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984)).
 
 
 72
 We believe that the district court abused its discretion when it ruled that Leo could not testify in his own defense concerning the reasons behind his refusal to fire Badolato. In a case such as this, where the crime charged is proven by circumstantial evidence largely based upon a trail of incriminating papers, the establishment of criminal motive is important to the government's case. The government contended that Leo's motive was to look good to his General Electric bosses. Leo should have been given the opportunity to explain in his own words why he refused to fire Badolato, since his refusal to fire Badolato was arguably inconsistent with the government's theory of motive.
 
 
 73
 Nevertheless, we agree with the government here that Leo was able to place before the jury through other witnesses every bit of evidence concerning his refusal to fire Badolato that he hoped to cover in his own testimony. The district court permitted Leo to say that he did not fire Badolato because it was not appropriate to do so. Leo also testified that he fully believed Badolato's story about why Badolato had altered purchase orders. Moreover, Badolato testified that Leo did not fire him because Leo thought Badolato's one mistake should not influence his opinion of Badolato. Thus, in his closing argument Leo's attorney was able to argue that Leo's refusal to fire Badolato refuted the government's suggested motive for Leo's alleged criminal acts. Though Leo is correct in contending that the district court's ruling limiting his testimony on the subject of Badolato's proposed firing infringed upon his constitutional right to put forth a complete defense, that error does not provide the basis for a new trial if the error was harmless beyond a reasonable doubt. See Arizona v. Fulminante, --- U.S. ----, 111 S.Ct. 1246, 1263-65, 113 L.Ed.2d 302 (1991); Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); United States v. Clemons, 843 F.2d 741, 753 (3d Cir.), cert. denied, 488 U.S. 835, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988).
 
 
 74
 As already noted, the district court's ruling did not prevent Leo from introducing through Badolato and other witnesses the substance of the reasons behind Leo's refusal to fire Badolato. This is not a case in which Leo was wholly precluded from telling the jury about his intervention on Badolato's behalf. While the district court erroneously restricted his personal narrative, the details of the incident that he contends were inconsistent with the government's proffered motive were before the jury by way of other evidence and were emphasized by his counsel in his closing address to the jury. At closing argument, Leo's counsel was able to use these facts to argue that since Leo did not have the motive to look good to his bosses in April of 1985, he did not have the same motive earlier during the period he was alleged to have committed his other crimes. On this record, we hold that the district court's ruling was harmless beyond a reasonable doubt.
 
 D.
 
 75
 Leo also claims that the district court abused its discretion in not admitting the testimony of General Electric auditor George Zippel (Zippel), who would have testified that he believed Leo's version of certain events over the version offered by a witness who was one of Leo's bosses, Gene Gilliland (Gilliland).
 
 
 76
 Gilliland testified at trial that he reminded Leo to update MATSCO's proposal to the Army to reflect current subcontractor prices. In his own testimony, Leo denied knowing of an obligation to update MATSCO's proposal to reflect current subcontractor prices. After Leo's attorney attempted to impeach Gilliland's testimony, the government called Zippel to the stand. Zippel testified that Gilliland, in 1985, had told Zippel the same thing that Gilliland later testified to at trial. The government offered Zippel's testimony as a prior consistent statement by Gilliland in order to rebut the implication that Gilliland's testimony was the result of intervening fabrication. Leo, however, wanted the district court to allow Zippel to testify that he believed Leo's rendition of the events rather than Gilliland's version. The district court did not allow this testimony, ruling that "it's up to the jury to decide whether or not the statements were correct or not...." Jt.App. at 758.
 
 
 77
 We have recognized that when two witnesses give conflicting testimony, "a question of fact [is] presented for the jury...." United States v. Rockwell, 781 F.2d 985, 990 (3d Cir.1986). We wrote in United States v. Ward, 169 F.2d 460, 462 (3d Cir.1948), that it is "axiomatic that the [witness] may not go [so] far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility." Instead, the inconsistency between the testimony Leo and Gilliland offered presented a credibility question peculiarly within the province of the jury.
 
 
 78
 The government did not offer Zippel as an expert on whether someone is telling him the truth. Likewise, Leo did not establish Zippel's qualification as someone particularly qualified to see through a fog of lies. Here, the jury heard Gilliland testify that he reminded Leo to update MATSCO's proposal to the Army to reflect current subcontractor prices. The jury also heard Leo deny in his testimony that Gilliland had ever made such a statement to him. The jury was so provided with a complete basis for examining each witness's credibility. Its verdict shows that the jury believed Gilliland's testimony over Leo's.
 
 
 79
 We fully agree with the district court that testimony from Zippel that he believed Leo rather than Gilliland would have been improper and unnecessary. That decision on credibility was one for the jury. Who Zippel believed is immaterial. The conflicts were before the jury and it was its decision, not Zippel's, that counted. Zippel's testimony simply was not helpful. The district court did not abuse its discretion in limiting Zippel's testimony in this manner.
 
 E.
 
 80
 Finally, Leo attacks the admission of the testimony of the government's first witness, Thomas Moran (Moran), an expert in the field of governmental contracting. Over Leo's objection, Moran testified concerning custom and practice in areas of the defense industry governed by the Act. Moran said that contractors generally provide updated cost and pricing data to the government during contract negotiations. Leo argues that Moran's testimony should have been excluded because it was nothing more than an improper legal opinion on the Act's requirement.
 
 
 81
 The trial court has wide discretion in determining whether expert testimony will be of help to the trier of fact. See United States v. Agnes, 753 F.2d 293, 303 (3d Cir.1985). While it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury, our Court has allowed expert testimony concerning business customs and practices. See, e.g., First Nat'l State Bank v. Reliance Elec. Co., 668 F.2d 725, 731 (3d Cir.1981) (per curiam) (allowing admission of evidence of customs and practices in the banking industry). In that case, we agreed with the district court that testimony concerning custom and practice was proper so long as the expert did not give his opinions as to legal duties that arose under the law. See also Fed.R.Evid. 704 advisory committee's note (Federal rules of evidence "stand ready to exclude opinions phrased in terms of inadequately explored legal criteria."); United States v. Unruh, 855 F.2d 1363, 1376 (9th Cir.1987) ("We have condemned the practice of attempting to introduce law as evidence."), cert. denied, 488 U.S. 974, 109 S.Ct. 513, 102 L.Ed.2d 548 (1988).
 
 
 82
 To the extent that it was limited to an explanation of business custom, Moran's testimony was relevant both to explain the practice of the industry in which this prosecution arose and to establish what someone with Leo's extended background in the industry probably would know. The district court took care to limit Moran's testimony so that he was not giving his opinion as to what the law required; instead, he testified, based upon his experience in the defense industry, as to how firms such as MATSCO operated when performing contracts governed by the Act. See Supp.App. at 3-7 (pre-trial ruling that Moran could testify concerning industry custom and practice but that district court would charge jury on applicable law); Supp.App. at 103-04 (denying motion to strike Moran's testimony); see also Supp.App. at 55 (sustaining objection to question asking Moran to testify concerning requirements under the Act but allowing Moran to answer question about custom and practice in defense industry).
 
 
 83
 Leo does not deny that he was given a full and fair opportunity to cross-examine Moran. Presumably, Leo could have introduced his own expert to testify about customs and practices in the defense industry. In fact, neither at trial nor on appeal did Leo assert that any of Moran's testimony concerning customs and practices in the defense industry was incorrect. Instead, Leo chose to argue to the jury that he was unfamiliar with the customs and practices about which Moran testified.
 
 
 84
 The district court did not abuse its discretion in permitting Moran's expert testimony as to customs and practices within the defense industry. Moran's testimony is analogous to the expert testimony we allowed in First Nat'l State Bank. It is also clear that it was within the district court's broad discretion to conclude that Moran's testimony about customs and practices within the defense industry would be helpful to the jury in understanding what someone with Leo's experience in that industry was likely to have known. See Fed.R.Evid. 702. Moreover, Leo has failed to argue, either before the district court or on appeal, that, assuming Moran gave impermissible legal opinions in his testimony, the legal opinions were incorrect. Thus, even if it were erroneous to admit some of Moran's testimony, the error would not be prejudicial. See Unruh, 855 F.2d at 1376. For these reasons, we reject Leo's attack upon Moran's testimony.
 
 IV.
 
 85
 Badolato's arguments in favor of his acquittal or, alternately, a new trial remain for consideration. He advances two arguments in his appeal. First, he asks us to hold as a matter of law that he did not violate 18 U.S.C.A. § 1505 and thus to set aside his conviction on count seven of the indictment, charging him with having violated that statute. Next, he contends that the district court erred in failing to charge the jury that it could consider his correction of earlier misstatements in determining whether he had the requisite intent to make a false statement under 18 U.S.C.A. § 1001.
 
 A.
 
 86
 Section 1505 makes it a crime to obstruct proceedings before departments, agencies and committees of the United States. Badolato argues that he did not violate § 1505 since the agency he was charged with having obstructed, the Defense Contract Audit Agency, lacks rule-making or adjudicative authority. Thus, he contends he did not obstruct a "proceeding" as that term is employed in § 1505. Section 1505 states, in relevant part:
 
 
 87
 Whoever corruptly ... influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States ...
 
 
 88
 Shall be fined not more than $5,000 or imprisoned more than five years, or both.
 
 
 89
 18 U.S.C.A. § 1505. Badolato's argument is premised in large part on Congress's enactment in 1988 of 18 U.S.C.A. § 1516 (West Supp.1991). Section 1516 specifically outlaws endeavors to obstruct or impede a federal auditor. Badolato argues that he obstructed a federal auditor before and during 1985 but that it was not a crime until 1988; otherwise Congress never would have enacted § 1516.
 
 Section 1516 states:
 
 90
 (a) Whoever, with intent to deceive or defraud the United States, endeavors to influence, obstruct, or impede a Federal auditor in the performance of official duties relating to a person receiving in excess of $100,000, directly or indirectly, from the United States in any 1 year period under a contract or subcontract, shall be fined under this title, or imprisoned not more than 5 years, or both.
 
 
 91
 (b) For purposes of this section the term "Federal auditor" means any person employed on a full- or part-time or contractual basis to perform an audit or a quality assurance inspection for or on behalf of the United States.
 
 
 92
 18 U.S.C.A. § 1516.
 
 
 93
 Badolato's argument that Congress's later passage of 18 U.S.C.A. § 1516 shows that § 1505 was not meant to be construed as broadly as other courts have construed it is a common confusion of subsequent enactments with the legislative history of the earlier statute. At best, Congress's 1988 passage of § 1516 shows that the 100th Congress took a narrow view of the scope of § 1505, but that narrow view is not controlling on the meaning of § 1505 because it was not the 100th Congress that passed § 1505. See Chapman v. United States, --- U.S. ----, ---- n. 4, 111 S.Ct. 1919, 1927 n. 4, 114 L.Ed.2d 524 (1991) (stating "subsequent legislative history [is] an unreliable guide to legislative intent"); Sullivan v. Finkelstein, --- U.S. ----, 110 S.Ct. 2658, 2665 n. 8, 110 L.Ed.2d 563 (1990) (noting "the usual difficulties inherent in relying upon subsequent legislative history") (citing United States v. United Mine Workers of Am., 330 U.S. 258, 281-82, 67 S.Ct. 677, 690, 91 L.Ed. 884 (1947)); Pension Benefit Guar. Corp. v. LTV Corp., --- U.S. ----, 110 S.Ct. 2668, 2678, 110 L.Ed.2d 579 (1990) (stating "subsequent legislative history is a 'hazardous basis for inferring the intent of an earlier' Congress") (quoting United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960)); United States v. Simmons, 679 F.2d 1042, 1048 (3d Cir.1982), cert. denied, 462 U.S. 1134, 103 S.Ct. 3117, 77 L.Ed.2d 1370 (1983). We are accordingly unpersuaded by this argument.
 
 
 94
 We cannot stop, however, with rejection of Badolato's effort to discern an earlier Congress's intent from the enactment of a later one. We must also consider his more general argument that § 1505 does not cover false statements to a federal auditor. Interestingly, our Court has never decided a case that has required us to construe either § 1505 or § 1516. To that extent, Badolato presents us with a case of first impression. However, the government does not contend that § 1505 reaches beyond the obstruction of an agency that has rule-making or adjudicative authority. Instead, it argues that the agency that Badolato obstructed acted under the direction of the Army's contracting officer, who had the authority to make adjudications on behalf of the Defense Department. Thus, the government maintains that Badolato did in fact obstruct a "proceeding" within the meaning of § 1505. In support, the government notes that Congress's specific prohibition of deceptive acts that impede federal auditors in § 1516 does not mean that prior law failed to make criminal some of the conduct that § 1516 also prohibits.
 
 
 95
 Whether Stern's audit constituted a proceeding as that term is employed in § 1505 presents a question of law. See United States v. North, 910 F.2d 843, 894 n. 29 (per curiam), modified on other grounds, 920 F.2d 940 (D.C.Cir.1990) (per curiam), cert. denied, --- U.S. ----, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). Other courts of appeals have broadly construed the term "proceeding" as that term is used in § 1505. The Sixth Circuit, in United States v. Fruchtman, 421 F.2d 1019, 1021 (6th Cir.), cert. denied, 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed.2d 86 (1970), rejected the "contention that the word 'proceedings' refers only to those steps before a federal agency that are juridical or administrative in nature." The Tenth Circuit, in United States v. Browning, Inc., 572 F.2d 720, 724 (10th Cir.), cert. denied, 439 U.S. 822, 99 S.Ct. 88, 58 L.Ed.2d 114 (1978), wrote:
 
 
 96
 In sum, the term "proceeding" is not, as one might be inclined to believe, limited to something in the nature of a trial. The growth and expansion of agency activities have resulted in a meaning being given to "proceeding" which is more inclusive and which no longer limits itself to formal activities in a court of law. Rather, the investigation or search for the true facts such as that which is described in the indictment here is not to be ruled as a non-proceeding simply because it is preliminary to indictment and trial.
 
 
 97
 See also United States v. Schwartz, 924 F.2d 410, 423 (2d Cir.1991) ("The term 'any proceeding' as used in § 1505 has been defined broadly."); United States v. Mitchell, 877 F.2d 294, 300 (4th Cir.1989) ("decisions have uniformly held that th[e] term ['administrative proceeding'] should be construed broadly to effectuate the statute's purpose"); United States v. Sutton, 732 F.2d 1483, 1490 (10th Cir.1984) ("Agency investigative activities are 'proceedings' within the meaning of § 1505."), cert. denied, 469 U.S. 1157, 105 S.Ct. 903, 83 L.Ed.2d 919 (1985); Rice v. United States, 356 F.2d 709, 712 (8th Cir.1966) ("Proceedings before a governmental department or agency simply mean proceeding in the manner and form prescribed for conducting business before the department or agency, including all steps and stages in such an action from its inception to its conclusion.").
 
 
 98
 The regulations that govern the Defense Contract Audit Agency provide that the Department of Defense will rely upon its services "in connection with [the] negotiation, administration, and settlement of contracts and subcontracts." 32 C.F.R. § 357.2(a) (1991). Given the broad meaning of the word "proceeding" and the Defense Contract Audit Agency's particular mission, we agree with the government that when Badolato obstructed Stern's search for the true purchase order dates, Badolato obstructed a proceeding within the meaning of § 1505.
 
 
 99
 The Defense Contract Audit Agency does not operate within a vacuum inside the Department of Defense; instead, as this case makes clear, the Agency serves an important role within the Department in uncovering and reporting serious fraud. Even though the Agency's investigatory audit comes at the preliminary stage of the investigation, it is crucial in departmental proceedings for the discovery of fraud. Without the Defense Contract Audit Agency's services, fraud might never be discovered. As the Eighth Circuit stated in Rice, "[g]overnmental agency proceedings frequently embrace both investigative and adjudicative proceedings." Rice, 356 F.2d at 713. Under the plain language of § 1505 and the case law construing it, Badolato's conduct was a crime.[6] For these reasons, we also reject his contention that the statute did not give him fair notice that his conduct was prohibited. We will therefore affirm his conviction on count seven of the indictment.
 
 B.
 
 100
 In support of his request for a new trial, Badolato says the district court erred in its charge to the jury. Badolato asked the district court to give the jury the following instruction with regard to the false statement charge against him:
 
 
 101
 [T]he government must prove beyond a reasonable doubt that Mr. Leo and Mr. Badolato purposefully and voluntarily submitted or aided and abetted the submission to the Army and the Defense Contract Audit Agency of a false schedule of specific dates for subcontractor negotiations. The government must further prove beyond a reasonable doubt that Mr. Leo and Mr. Badolato acted with the specific intent to deceive the Army and the Defense Contract Audit Agency.
 
 
 102
 In this case, there has been evidence that Mr. Badolato, by changing the dates on certain documents, caused the submission to the Defense Contract Audit Agency of inaccurate information on the December 14, 1984 schedule of subcontractor negotiation dates. However, there also has been evidence that Mr. Badolato, shortly afterwards, told his superiors at MATSCO of his alterations. There also has been evidence that MATSCO, in turn, notified the Defense Contract Audit Agency that the information on the December 14, 1984 schedule was inaccurate and, accordingly, retracted this incorrect information. The fact that Mr. Badolato acknowledged his submission of incorrect information and retracted it is relevant in showing lack of intent to commit a false statement. You may consider evidence of Mr. Badolato's willingness to correct his misstatements in judging whether Mr. Badolato acted with the specific intent to deceive the Army and the Defense Contract Audit Agency. If you find that Mr. Badolato did not act with the specific intent to deceive the Army and the Defense Contract Audit Agency, then you must find Mr. Badolato not guilty of Count Nine.
 
 
 103
 Jt.App. at 157-158.
 
 
 104
 The government says the district court did not abuse its discretion but properly rejected what the government characterizes as a misleading and argumentative instruction. In Smith, we stated that we will order a new trial on account of a district court's refusal to give a proposed jury instruction "only if the instruction was correct, not substantially covered by other instructions, and was so important that the omission of the instruction prejudiced the defendant." Smith, 789 F.2d at 204.
 
 
 105
 Here, the district judge instructed the jury as to all elements of a false statement offense. The district court told the jury that it should decide the intent question from a consideration of all the surrounding circumstances that indicated the defendant's state of mind, including Badolato's retraction. See Jt.App. at 959.
 
 
 106
 Aside from the fact that the district court's actual instructions largely covered Badolato's proposed instruction, his proposed instruction contained an inaccurate statement of law. In order to be convicted of making a false statement, the government need only prove that the defendant knew that the statement he made was false; the government does not have to prove that the defendant made the statement with the specific intent to deceive the Army or the Defense Contract Audit Agency. See Yermian, 468 U.S. at 69, 73, 104 S.Ct. at 2939, 2941.
 
 
 107
 Our review of the record satisfies us that the district court covered the substance of the valid portion of Badolato's suggested instruction and properly omitted the legally erroneous part. The district court did not abuse its discretion in deciding not to give Badolato's instruction verbatim. We will thus affirm Badolato's conviction for having made a false statement.
 
 V.
 
 108
 For the reasons explained above, we will affirm the judgments of conviction and sentence entered against Leo and Badolato.
 
 
 
 *
 Hon. D. Brooks Smith, District Judge of the United States District Court for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 All of the counts against all of the defendants, except for the racketeering count, were accompanied by a reference to 18 U.S.C.A. § 2 (West 1969), which makes aiders and abettors punishable as principals
 
 
 [2]
 The relevant provisions of these amendments were superseded by certain parts of Pub.L. No. 99-500, Title I, § 101(c), 100 Stat. 1783-166 to 1783-169 (1986). These new provisions are not applicable to this case because they were not in effect until February 15, 1987
 
 
 [3]
 Leo argues that he did not receive the list directly from Stern but instead received it from one of Leo's supervisors at General Electric. Accordingly, Leo contends that the government was then burdened with the need to prove the instructions Leo's supervisor gave him about the dates on the list, and since the government failed to introduce any evidence on that point, his conviction must be reversed. However, Stern testified that he gave the list directly to Leo in November of 1984, even though Stern also gave a copy of the same list (without Leo's dates) to Leo's supervisor on December 11, 1984. Leo did not return his list to Stern until December 14, 1984
 The jury was entitled to believe Stern's version of the events, that Stern himself gave Leo the list with instructions on what information was needed, over Leo's version that Leo's own supervisor gave him the list with instructions presumably different than those Stern described in his testimony.
 
 
 [4]
 June 2, 1983, it should be remembered, was the date on which General Electric certified to the Army that all cost data contained in the final price agreement were accurate, current and complete
 
 
 [5]
 We believe that the district court construed Rule 701 correctly and thus reject Leo's contention, see Brief for Leo at 29 n. 13, that the district court erred as a matter of law. See United States v. Furst, 886 F.2d 558, 571 (3d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990)
 
 
 [6]
 Because the plain language of § 1505 prohibits Badolato's conduct, we would not be justified in thwarting the intent of the Congress that passed § 1505 by narrowing § 1505's scope to a field more limited than that shown by its plain meaning. We are not deciding whether Badolato's conduct constitutes a crime under § 1516. He was not charged with violating that section, nor could he have been so charged with violating § 1516 given the constitutional prohibition against ex post facto laws. Badolato was charged with committing crimes in the years leading up to 1985, and Congress did not pass § 1516 until 1988. See Collins v. Youngblood, --- U.S. ----, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990) (quoting Calder v. Bull, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798) (Chase, J.))